PLANNED PARENTHOOD FEDERA-
TION OF AMERICA, INC.; Planned
Parenthood Center of El Paso; Stewart
R. Mott; Stephen L. Isaacs, Sosamma
Lindsay and Rebecca Ramos, on Behalf
of themselves and others similarly situ-
ated, and Jane Doe, on Behalf of her-
self and others similarly situated,
Plaintiffs,

v.

AGENCY FOR INTERNATIONAL DE-
VELOPMENT and M. Peter McPher-
son, as Administrator of the Agency for
International Development, Defend-
ants.

No. 87 Civ. 0248 (JMW).

United States District Court,
S.D. New York.

Sept. 29, 1987.

Howard M. Fry, General Counsel, Ste-
phen R. Tisa, Atty., Agency for Intern.
Development, Washington, D.C., for de-
fendants; Paula A. Sweeney and Harriet
Goldberg, Asst. U.S. Attys., of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., for U.S.

Roger K. Evans, Eve Paul and Dara
Klassel, Planned Parenthood Federation of
America, New York City, Walter B. Slo-
combe, Geoffrey Judd Vitt and Julia L.
Porter, Caplin & Drysdale, Chartered,
Washington, D.C., for plaintiffs; Harriet
Pilpel, New York City, of counsel.

MEMORANDUM AND ORDER

WALKER, District Judge:

*Introduction*

This case raises the question, among oth-
ers, of the circumstances under which the

courts should refrain from entering the realm of foreign policy committed to the political branches of government. In their Complaint, plaintiffs attack the statutory and constitutional validity of (i) a Presidential policy denying federal assistance to foreign non-governmental organizations ("NGOs") that "perform or actively promote abortion as a method of family planning in other nations" [1] ("Policy" "Mexico City Policy") and (ii) a standard contract provision through which the agency charged with dispersing federal family planning assistance implements the Policy. The government defendants move to dismiss the Complaint. They assert that the Complaint fails to state a claim upon which relief can be granted since the statutory challenge is meritless and because the constitutional challenge (a) involves a "political question" beyond the competence of the courts and (b) may not be raised by these plaintiffs who lack standing. On a Rule 12(b)(6) motion, such as this, the allegations of the Complaint are presumed true and the reasonable inferences therefrom are construed in plaintiffs' favor. *Sheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

### *Statutory and Factual Background*

1. The Statute and Certain Funding Features

The Foreign Assistance Act of 1961, *as amended*, 22 U.S.C. §§ 2151 *et seq.* ("FAA"), empowers the President to furnish assistance for foreign population planning. The FAA recognizes that effective family planning is "often a matter of political and religious sensitivity," 22 U.S.C. § 2151b(a), and authorizes the President "to furnish assistance, on such terms and conditions as he may determine, for voluntary population planning." 22 U.S.C. § 2151b(b).

The Act then limits Presidential discretion by prohibiting the use of federal money to further certain abortion related activities. It precludes, in 22 U.S.C. § 2151b(f), the use of family planning funds (i) to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions; (ii) to pay for the performance of involuntary sterilizations as a method of family planning or to motivate or coerce or provide any financial incentive to any person to undergo sterilizations; and (iii) for any biomedical research relating to abortion or involuntary sterilization as a means of family planning.[2]

In all relevant respects, the President has delegated his § 2151(b) discretionary authority to the Director of the United States International Development and Cooperation Agency ("IDCA"). Exec. Order No. 12,163, 44 Fed.Reg. 56,673 (1979). The Director of IDCA, in turn, has delegated that authority to the Administrator of the Agency for International Development ("AID"). IDCA Delegation No. 1, 44 Fed. Reg. 57,521 (1979), as amended, 45 Fed. Reg. 74,090 (1980).

Under the authority of § 2151b(b), AID provides funds through family planning grants and cooperative agreements to international agencies, foreign governments and both foreign and domestic NGOs. An AID grantee, whether foreign or domestic, may then subgrant funds it receives from AID. AID evaluates and passes upon applications for funds under a variety of criteria, many of which are set forth in a document known as "AID Handbook 13 (grants)" ("Handbook 13"). This document contains a number of standard provisions for insertion into population planning grants and cooperative agreements with NGOs, including the one that plaintiffs challenge here.

---

1. Policy Statement of the United States of America at the United Nations International Conference on Population (Second Session) 5, Mexico, D.F. (August 6–13, 1984). *See* Attachment to Defendant's Memorandum of Law.

2. In addition, in the Foreign Assistance and Related Programs Appropriations Act for the fiscal year 1985, Pub.L. No. 98–473, 98 Stat. 1884, 1887–88, (1984) Congress prohibited distribution of funds to any organization that "includes as part of its population planning programs involuntary abortion."

### 2. The Mexico City Policy Statement

In August 1984, a United States delegation to the United Nations International Conference on Population in Mexico City presented a statement of United States policy on the subject of population growth to the 140 nation conference ("Mexico City Policy Statement"). The Mexico City Policy Statement was issued by the White House on July 13, 1984. In pertinent part, it states:

> The International Conference on Population offers the U.S. an opportunity to strengthen the international consensus on the interrelationships between economic development and population which has emerged since the last such conference in Bucharest in 1974. Our primary objective will be to encourage developing countries to adopt sound economic policies and, where appropriate, population policies consistent with respect for human dignity and family values. As President Reagan stated in his message to the Mexico City Conference:
>
>> 'We believe population programs can and must be truly voluntary, cognizant of the rights and responsibilities of individuals and families, and respectful of religious and cultural values. When they are, such programs can make an important contribution to economic and social development, to the health of mothers and children, and to the stability of the family and of society.'
>
> U.S. support for family planning programs is based on respect for human life, enhancement of human dignity, and strengthening of the family. Attempts to use abortion, involuntary sterilization, or other coercive measures in family planning must be shunned, whether exercised against families within a society or against nations within the family of man.
>
> The United Nations Declaration of the Rights of the Child [1959] calls for legal protection for children before birth as well as after birth. In keeping with this obligation, the United States does not consider abortion an acceptable element of family planning programs and will no longer contribute to those of which it is a part. Accordingly, when dealing with nations which support abortion with funds not provided by the United States Government, the United States will contribute to such nations through segregated accounts which cannot be used for abortion. Moreover, the United States will no longer contribute to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations [sic]. With regard to the United Nations Fund for Population Activities [UNFPA], the U.S. will insist that no part of its contribution be used for abortion. The U.S. will also call for concrete assurances that the UNFPA is not engaged in, or does not provide funding for, abortion or coercive family planning programs; if such assurances are not forthcoming, the U.S. will redirect the amount of its contribution to other, non-UNFPA, family planning programs.
>
> In addition, when efforts to lower population growth are deemed advisable, U.S. policy considers it imperative that such efforts respect the religious beliefs and culture of each society, and the right of couples to determine the size of their own families. Accordingly, the U.S. will not provide family planning funds to any nation which engages in forcible coercion to achieve population growth objectives.
>
> U.S. Government authorities will immediately begin negotiations to implement the above policies with the appropriate governments and organizations.[3]

### 3. AID's Grant Conditions

Following the Mexico City Policy Statement, AID adopted new eligibility provisions for foreign NGOs for insertion, after negotiation, in family planning grants and cooperative agreements. *See* the "Standard Provision to be Used in Grants and Cooperative Agreements with U.S. Nongovernmental Organizations" attached as

---

**3.** Policy Statement of the United States of America at the United Nations International Conference on Population (Second Session), at pp. 4–5.

*See* Attachment to Defendant's Memorandum of Law.

Exhibit A to the Complaint ("Standard Clause").[4] Effective as of July 1985, it requires foreign NGOs to certify that they do not perform or actively promote abortion as a method of family planning in AID–recipient countries or provide financial support to any other foreign NGO that conducts such activities and, furthermore, that they will not do so during the term of the grant. *Id.* at 3. Domestic NGO AID–recipients, as a condition to the receipt of a family planning grant, must agree that they "will not furnish assistance under this grant to any foreign [NGO] which performs or actively promotes abortion as a method of family planning in AID–recipient countries or which provides financial support to any other foreign [NGO] that conducts such activities." *Id.* at 2–3.

Under this funding restriction, domestic NGOs are not prevented themselves from performing or actively promoting abortion as a method of family planning. While they may not subgrant AID funds to foreign NGOs that perform or actively promote abortion, they may provide any non-AID funds to foreign NGOs for any purpose, including performance and promotion of abortion.

### The Instant Action

The Complaint, filed in January 1987, challenges the constitutionality of the Standard Clause and the Policy, claiming, in essence, that they impose (i) an impermissible restriction on the First Amendment rights of plaintiffs to speak and advocate as to the availability and benefits of abortion and to associate for purposes of such speech and advocacy with foreign individuals and entities (Count One) and (ii) an interference with the privacy rights of family planning information recipients (Count Two). The Complaint also alleges that AID's adoption of the Standard Clause as a grant condition lacks statutory authority (Count Three) and was adopted in violation of the Administrative Procedure Act (Count Four) and the due process clause of the

Fifth Amendment (Count Five). In responding to the instant motion, plaintiff-respondents have abandoned their claims under Counts Four and Five.

By way of relief, plaintiffs request (i) the issuance of a declaratory judgment that AID's policy of requiring that AID family planning fund recipients agree not to perform or actively promote abortions (as delineated in the Standard Clause) is invalid and unenforceable; (ii) an injunction barring AID's use of the Standard Clause as a condition to family planning funding; and (iii) an injunction that AID consider the application for AID funding of Plaintiff Planned Parenthood Federation of America, Inc. ("PPFA") without regard to PPFA's position on abortion.

Plaintiffs in this action are:

(1) PPFA whose formal program objectives include "assist[ing] selected organizations in developing countries to increase access to voluntary fertility regulations services, including legal abortion, through information and education, provision of medical services, commodity distribution and lobbying." PPFA provides family planning funds, both AID and non-AID funds, to foreign NGOs in furtherance of the above policy objectives among others. PPFA conducts its international funding activities through its Family Planning International Assistance ("FPIA") division.

(2) Planned Parenthood Center of El Paso, Inc. ("PPCEP"), a PPFA affiliate that provides family planning and counselling services to El Paso County, Texas and has a "longstanding concern about the access to safe and legal voluntary fertility regulation services, including abortion, in developing countries, especially Mexico."

(3) Stewart R. Mott ("Mott") who is "active in a variety of public policy issues" and a "regular contributor to PPFA for its international advocacy programs."

(4) Stephen L. Isaacs ("Isaacs") who is employed at Columbia University's Center for Population and Family Health as Di-

---

**4.** The Standard Clause also appears in AID Handbook 13. *See* Attachment to Defendants' Memorandum of Law.

rector of the Development Law and Policy Program, a clearing house for family planning and related policy information in less developed countries.

(5) Sosamma Lindsay ("Lindsay") who is Dean of the University of East Africa's College of Nursing in Kenya. The University, although not its College of Nursing, receives AID funds for family planning.

(6) Rebecca Ramos ("Ramos"), who is a Director of Research and Special Projects for an unnamed NGO in Mexico that receives AID family planning funds from FPIA and other AID recipients.

(7) Jane Doe ("Doe") who is a patient of the First Foundation Medical Center in Lagos, Nigeria. First Foundation Medical Center is a recipient of AID family planning funds through an FPIA subgrant.

The individual plaintiffs are all United States Citizens. Plaintiffs Lindsay, Ramos and Doe sue on their behalf and on behalf of two classes: employees of NGOs and women who rely on family planning information provided by NGOs. By stipulation, the resolution of issues related to class certification has been deferred pending the outcome of defendants' motion to dismiss.

Defendants to the action are AID and its Administrator, M. Peter McPherson, to whom the President's authority to furnish voluntary population planning assistance has been delegated.

## Discussion

### 1. Statutory Authority

In Count Three plaintiffs allege that the President lacks statutory authority to adopt and implement the Mexico City Policy through AID's new eligibility provisions. Inquiry into the Executive's power to place conditions on receipt of a congressionally authorized grant begins with an examination of the statute that empowers the President to confer the grant. Section 104(b) of the FAA authorizes the Executive to furnish family planning assistance to foreign organizations "on such terms and conditions as he may determine." Nowhere does the language of the FAA limit the Executive's discretion to deny funds to for-

eign NGOs, including those that perform or actively promote voluntary abortion as a method of family planning. Thus, the statute on its face appears to vest in the President authority to adopt and implement the Mexico City Policy.

The plaintiffs, however, point to several provisions in the FAA which, they argue, preclude the President from denying federal aid to foreign NGOs which perform or promote abortion. First, they contend that the exercise of the President's discretion is limited by §§ 2151(a) and 2151u(a). Section 2151(a) declares that a principle objective of United States foreign policy is to aid developing countries in the acquisition of "the knowledge and resources essential to development." Section 2151u(a) affirms United States commitment to assistance of private organizations in their efforts to further development overseas and states that "it is in the interest of the United States that such organizations and cooperatives expand their overseas development efforts without compromising their private and independent nature." According to plaintiffs, the Mexico City Policy is inconsistent with §§ 2151(a) and 2151u(a) and, therefore, the President has exceeded his powers under the FAA by adopting it.

In *Alan Guttmacher Institute v. McPherson*, 616 F.Supp. 195 (S.D.N.Y. 1985), *aff'd*, 805 F.2d 1088 (2d Cir.1986) Judge Haight considered the impact of § 2151(a) on the exercise of Presidential discretion under § 2151b(b). He concluded that AID may refuse to fund publication of articles discussing abortion despite the precatory language of § 2151(a). *Alan Guttmacher Institute*, 616 F.Supp. at 209. In Judge Haight's view, AID is charged with the task of distributing limited funds among numerous competing projects and "must be given broad discretionary power to create priorities to ease and objectify the job of picking and choosing among potential projects." *Id.* at 207. Selection by the Executive of areas most deserving of United States assistance, thus, does not violate § 2151(a) and, in fact, ideally leads to "the most efficient dissemination of the most important knowledge." *Id.* at 208.

■ Judge Haight's reasoning is instructive in this case. The Mexico City Policy prohibits United States support for foreign NGOs which, with their own money, perform or promote abortion as a method of family planning. This limits United States support for dissemination of specific information. The Policy, however, also frees funds for dissemination of other information considered more important by the Executive. "[T]he mere fact that this policy results in the failure to spread a certain type of knowledge does not necessarily set it at odds with the broad informational purpose of the statute." *Alan Guttmacher Institute,* 616 F.Supp at 208. Accordingly, we conclude that Section 2151(a) does not limit Presidential discretion to adopt the Mexico City Policy.

■ Nor does § 2151u(a)'s language in support of the "private and independent nature" of private organizations restrain the President from withholding United States funds from foreign NGOs that perform or promote abortion. Any criteria used by the Executive to select organizations for AID funding arguably impacts their "private and independent nature" because each must meet Executive eligibility requirements. The mere fact that the Mexico City Policy may affect the behavior of NGOs who freely choose to alter or forego certain practices in order to qualify for AID funding does not compromise the independent nature of these organizations within the meaning of § 2151u(a).[5]

■ Plaintiffs next argue that since Congress limited the Executive's discretion through specific restrictions regarding use of AID funds for abortion-related activities in the FAA, § 2151b(f)(1) (the "Helms Amendment," adopted in 1973)[6], § 2151b(f)(3) (adopted in 1981)[7], and in the Foreign Assistance and Related Programs Appropriations Act for fiscal year 1985, Pub.L. No. 98–473, 98 Stat. 1884, 1887–8 (1984) ("Appropriations Act for 1985") (adopted in 1984)[8], Congress thereby intended that there be no other restrictions on foreign financial assistance including any requirement that foreign NGOs receiving U.S. funding not perform or promote abortion. In plaintiffs' view, Congress thus proscribed the President's authority to adopt the Mexico City Policy. We do not agree.[9]

---

**5.** Section 2151u(a) might prohibit AID's entanglement in the day-to-day administration of a voluntary organization or an AID requirement that an organization *affirmatively* espouse a certain viewpoint. No such situation is before the Court today. Further, the Court notes that the Mexico City Policy and AID eligibility requirements properly leave PPFA free to support with its own funds any NGO that fails to meet AID eligibility standards.

**6.** "None of the funds made available to carry out this subchapter may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions." 22 U.S.C. § 2151b(f)(1).

**7.** "None of the funds made available to carry out this subchapter may be used to pay for any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning." 22 U.S.C. § 2151b(f)(3).

**8.** "None of the funds appropriated under this paragraph may be available to any country which includes as part of its population planning programs involuntary abortion: *Provided further,* That none of the funds appropriated under this paragraph may be available to any organization which includes as part of its population planning programs involuntary abortion." Foreign Assistance and Related Programs Appropriations Act for fiscal year 1985, Pub.L. No. 98–473, 98 Stat. 1884, 1887–8 (1984).

**9.** Plaintiffs also argue that even if the President's statutory authority permits him to deny funds to foreign NGOs that perform or promote abortions, his decision to do so in this instance exceeded that authority. This is because, according to plaintiffs, the President adopted the Mexico City Policy, not for legitimate foreign policy purposes, but as part of a domestic political program.

The courts are not equipped to discern the legitimacy of Presidential motivation for adoption of policy decisions. Any attempt to assess such motivation would lead to an inevitable conflict between the courts and the Executive branch as the courts would be required to delve into the discussions, considerations, and decisions that are exclusively the province of the political branches. *See Winpisinger v. Watson,* 628 F.2d 133, 140 (D.C.Cir.1980), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980). With respect to plaintiffs' claim of an illegitimate foreign policy purpose, we note in passing that not only was the Policy at issue presented to an International Conference on

The foregoing amendments to the FAA and to the Appropriations Act for 1985, which restrict United States funding of abortion-related activity abroad, fall far short of evidencing a Congressional intent to require AID funding of foreign NGOs that perform or promote abortion. The FAA confers broad discretion on the President to disperse AID funds "on such terms and conditions as he may require." 22 U.S.C. § 2151b(b). The amendments to the FAA and any Appropriations Act language, therefore, must be construed in light of this unfettered discretion. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981), quoting *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.") Congress has carefully tailored each amendment to withdraw from the President power to fund specific abortion-related activities. There is nothing in these provisions that prevents the President, in his discretion, from further limiting United States support for abortion related activities by adopting the Mexico City Policy. Congress has not touched the Executive's overall discretion to advance population policies by favoring certain projects over others. Therefore, absent a specific limitation on the Executive's authority to condition dispersal of United States funds to foreign NGOs, it must be assumed the Congress has left intact his discretion to refuse to do so. *See Alan Guttmacher*, 616 F.Supp. 195, 209 ("It cannot be assumed from the Congressional action in 1973 and 1981 that Congress affirmatively intended the President to accept neutral, informational abortion-related research as a necessarily proper objective of § 2151b funds.") *See also Haig*, 453 U.S. at 292, 101 S.Ct. at 2774; *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 321, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936).

Indeed, our examination of the legislative history of the amendments to the FAA reveals that Congress has considered whether or not the United States should support foreign NGOs that perform or promote abortion, but has chosen not to interfere with Executive discretion in that area.[10] Most instructive is the reaction of Congress to the Executive's adoption of the Mexico City Policy. In 1984, as part of the Appropriations Act for 1985, the House of Representatives adopted a "Sense of the House" condemning the Policy.[11] One year later, during consideration of the International Security and Development Cooperation Act of 1985, Pub.L. No. 99–83, 99 Stat. 190, the House of Representatives adopted an amendment endorsing the Policy. 131 Cong.Rec. H5348–H5355, daily ed., July 10,

Population, but its principle, not to support abortion as a method of family planning was substantially adopted by the Conferees. Report of the International Conference on Population, 1984 Mexico, Recommendation 18(e) at 21.

**10.** As early as 1973, when the Helms Amendment was adopted, Senator Helms, noted that:

We could, in fact, go far beyond the present amendment and require all abortion activities, from whatever funds, to be stopped before our assistance could be received. But the present amendment does not do that. It only requires that the United States does not participate in the spread of abortive practices.

119 Cong.Rec. S32293, daily ed., Oct. 1, 1973. The Conference Committee Report to the 1981 amendment to the FAA speaks of "necessary limits" provided by the Helms Amendment and the 1981 prohibition on biomedical research on abortion as a method of family planning. H.R. Conf.Rep. No. 413, 97th Cong., 1st Sess., 69,

Pub.L. No. 97–113 (1981), U.S.Code Cong. & Admin.News 1981, p. 2404. Congress, thus, has provided *minimum* rather than *exclusive* limits on provision of federal aid to organizations that perform or promote abortion as a method of family planning.

**11.** "It is further the sense of the House of Representatives that United States population assistance shall be administered in accordance with and faithful to these laws as interpreted by AID's 1982 'Policy Paper: Population Assistance' and that no funds shall be denied to multilateral as well as nongovernmental and private and voluntary organizations because of their participation, paid for by funds other than those appropriated by the Congress, in activities conducted in accordance with all applicable United States Federal laws and regulations." Foreign Assistance and Related Programs Appropriations Act for fiscal year 1985, Pub.L. No. 98–473, 98 Stat. 1884, 1888 (1984).

1985.[12] Meanwhile, the Senate adopted an amendment to the statute prohibiting the Policy. S.Rep. No. 34, 99th Cong., 1st Sess., p. 32 (1985), U.S.Code Cong. & Admin.News 1985, p. 158.[13] In the Conference Committee both amendments were withdrawn as a compromise to the disparate House and Senate positions.[14] Thus, Congress, while adverting to the question, never acted to either approve or condemn the Mexico City Policy, but left the issue in the hands of the Executive. Accordingly, the Court concludes that the President did not exceed his authority under the FAA in adopting the Mexico City Policy and that AID did not exceed its authority in conditioning receipt of AID funds upon compliance with the Standard Clause.[15] Thus, Count Three must be dismissed for failure to state a claim upon which relief can be granted.

### 2. Constitutional Claims

■ Counts One and Two of the Complaint allege that the Mexico City Policy and AID Standard Clause deny them First Amendment and privacy rights under the United States Constitution. Defendants move to dismiss these claims on the grounds that they challenge a foreign policy determination by the Executive branch and, therefore, the Court is presented with a non-justiciable political question. Plaintiffs, on the other hand, insist that they challenge not "the wisdom of foreign policy, which they agree is a matter for Congress and the President," but the constitutionality of the Clause, "as a means of implementing that policy." Plaintiff's Memorandum of Law at 22.

The starting point in assessing whether a controversy presents a non-justiciable political question is *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In that case the Supreme Court articulated six categories into which political questions generally fall. The Court stated:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due co-ordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710.

If any one of the foregoing formulations is "inextricable from the case at bar" a non-justiciable political question is presented. *Id.*

---

**12.** The House version permitted the President to "deny funds for population planning purposes ... [to a foreign NGO] ... because of the types of voluntary and coercive family planning programs which it carries out or promotes...." 131 Cong.Rec. H5351, daily ed., July 10, 1985.

**13.** The Senate version stated:
"In determining eligibility for assistance under this subsection, the administrator ... shall not subject any nongovernmental or multilateral organization to any requirement more restrictive than any requirement applicable to a foreign government for such assistance." S. 960, 99th Cong. § 303(b) (1985).

**14.** "The conference substitute reflects the compromise agreed to by the conferees under which both the House and the Senate recede from their positions." H.Conf.Rep. No. 237, 99th Cong., 1st Sess., 118, Pub.Law No. 99–83 (1985), U.S.Code Cong. & Admin.News 1985, p. 227.

**15.** The Court notes that Congress, following the extensive debates in 1984 and 1985 over the wisdom of the Mexico City Policy, has appropriated funds for AID three times. The Foreign Assistance Appropriations Act, Pub.Law 98–473, 98 Stat. 1837; the 1986 Foreign Assistance Appropriations Act, Pub.Law No. 99–190, 99 Stat. 1185, 1291–1295; and the 1987 Foreign Assistance Appropriations Act, Pub.Law 99–591, 100 Stat. 3341. Although Congress need not ratify the President's actions because they were authorized under the FAA, these appropriations, nevertheless, evidence Congressional consent thereto. *See DaCosta v. Laird,* 448 F.2d 1368, 1370 (2d Cir.1971), *cert. denied,* 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972).

In evaluating this case under the standard of *Baker v. Carr,* the Court must consider the nature of the case and the questions it raises. Initially, the Court notes that it falls into that category of cases, within the broader class of political question cases, which touch on the foreign policy of the United States.

It has long been held that questions directed to the foreign relations of the United States are subjects committed to the exclusive authority of the political branches of government. U.S. Const. Art. I, § 8; *Id.* Art. 2, § 2. *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 626 (1918) ("[t]he conduct of the foreign relations of our government is committed by the Constitution to the Executive and Legislative—'the political'—Departments ..."); *See United States v. Curtis-Wright Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Chicago and Southern Airlines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 113–14, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948); *Atlee v. Laird,* 347 F.Supp. 689, 704–05 (E.D.Pa. 1972) (three-judge court), *aff'd sub nom. mem., Atlee v. Richardson,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). Frequently foreign policy decisions require the use of standards that the judiciary is ill-suited to formulate or to apply, or involve the exercise of discretion committed to a political branch or require a single-voiced statement of the Government's views. *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 707. As plaintiff rightly points out, however, not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* *See also Olegario v. United States,* 629 F.2d 204, 217 (2d Cir. 1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).[16] A district court must determine whether the core issues challenge a foreign policy determination or raise questions of foreign policy not susceptible of judicial resolution or whether instead they challenge executive action which, while it may have foreign relations consequences, affects constitutional rights which are within the competence of the courts to determine. The Supreme Court has endorsed a case-by-case approach:

> Our cases in this field [of questions touching foreign relations] seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case and of the possible consequences of judicial action.

*Id.* at 211–12.

In this case the Complaint directly attacks the foreign policy of the United States and, in so doing, raises questions beyond the competence of the court. While plaintiffs have drafted it as a challenge to the AID Standard Clause and claim that the Clause infringes their First Amendment[17] and privacy rights, the relief they request, if granted, would nullify the Mexico City Policy denying United States assist-

---

**16.** Plaintiffs cite *Olegario* for the proposition that courts, which will not adjudicate the wisdom of foreign policy, nevertheless, will weigh foreign policy against constitutional standards. *Olegario,* however, assessed an alien's right to naturalization in light of the Executive's foreign policy decision 35 years earlier and is, thus, distinguishable from this case in which current foreign policy is at issue.

**17.** PPFA asserts that if the Standard Clause for foreign NGO's is given effect it will not be able to communicate to foreign NGO's its policy of "increas[ing] access to voluntary fertility regulation services, including legal abortion, through information and education, provision of medical services, commodity distribution and lobbying." (Comp. ¶ 16). It will be "prevented by U.S. Government action from associating ... with many of the most logical and effective potential foreign partners because the policy will forbid those foreign [NGO's] from engaging in [abortion related] communication" (Comp. ¶ 54).

The court notes that the Standard Clause does not restrict PPFA, or other domestic NGO's which receive AID funds for transmittal to foreign NGO sub-recipients, from using their own non-U.S. sourced funds for any purpose, including the performance or promotion of abortion. (However, under the Standard Clause, this could not occur if the foreign NGO also chooses to receive U.S. funds). Thus, PPFA is free to engage in abortion advocacy activities abroad using its own employees, foreign NGO's, foreign governmental organizations or any means it chooses.

ance to foreign NGOs that perform or promote abortion[18] and plaintiffs leave no doubt that that is their objective. In addition, the Complaint seeks to invalidate AID's policy[19] requiring compliance with the Standard Clause not merely because it is statutorily and constitutionally infirm, but "because it is part of a long series of efforts by the Reagan administration to suppress views and activities related to the constitutional right of reproductive freedom." (Comp. ¶ 7; *see also* ¶ 3).[20] The Complaint is targeted not merely at a method or means of implementation of a foreign policy, but at the foreign policy itself. Since this is the case, we agree with defendants that the constitutional claims herein are non-justiciable.

It is clear to this Court that the fact finding necessary to resolve the questions raised in this case lacks "judicially discoverable and manageable standards." *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710.[21] The Court would have to consider the alleged First Amendment and privacy right deprivations against the Executive's foreign policy determination not to grant financial assistance to foreign NGOs that perform or actively promote abortion as a method of family planning. The Court would become a forum for the plaintiffs to engage the political branches in debate on the wisdom of the eligibility policy and the proper distribution of population planning assistance funds in various foreign countries and would be required to render pronouncements on the soundness and importance of the Policy. Inquiry into the Executive's considerations[22] in establishing the foreign policy at issue thus would be necessary. For instance, we would need to address such questions as: (i) the principle the President wishes this policy to advance together with the benefits or the harm to the United States in advancing it; (ii) the importance of this principle to the international community; and (iii) the policy's impact within each affected country, including upon that country's religious institutions, political factions and the government.

The courts are simply not equipped to assess the foreign policy implications of either the Mexico City Policy, or a judicial

---

**18.** Plaintiffs seek (1) a declaratory judgment that the defendants' requirement that AID family planning fund recipients agree to the limits of the Standard Clause is "invalid and unenforceable;" (2) an injunction preventing defendants from further implementing the policy;" and (3) an injunction "prohibiting them from considering PPFA's views on abortion and reproductive rights in reviewing its [funding] application (Comp. ¶ 7).

**19.** The "policy" referred to in the Complaint has chameleon-like characteristics. In ¶ 29, it is the statement at Mexico City that the United States government "would no longer contribute to separate [NGO's] which perform or actively promote abortion as a method of family planning in other nations." In the request for relief, it becomes the "defendants' policy of requiring that recipients of AID family planning funds agree to the limits of the [Standard Clause]." (Comp., "Relief Sought," ¶ 1). This confusion, whether deliberate or not, further supports the Court's view that the Complaint seeks a court order freeing foreign NGO's and their intermediaries from the strictures of the Mexico City Policy statement set forth in ¶ 29.

**20.** The plaintiffs' request is consistent with their objective of obtaining judicial review of the Mexico City Policy itself. They seek documents from AID concerning "contacts" and "communi-

cations" with the White House, the Office of Management and Budget, Congress, with others in the State Department and with foreign officials, governemnts and nongovernmental organizations related to AID funding of PPFA, AID funding of organizations engaged in abortion or abortion related activities, the Mexico City Population Conference, "the reasons for; purposes of; consideration, drafting, approval and announcement of; legal authority for; possible effects of; and implementation of;" the Policy and the Standard Clause.

**21.** Plaintiffs contend that the issues presented in this case are "judicially discoverable and manageable," claiming that "the standards for deciding this case are the entirely manageable ones of the Bill of Rights, with which the Court is entirely familiar." Plaintiff's Memorandum of Law at 28. Plaintiffs seek to limit application of the second prong of *Baker v. Carr* to cases in which military issues are involved. We do not read the "judicially discoverable and manageable" standard so narrowly and we disagree with plaintiffs' characterization of the issues presented by this case.

**22.** The plaintiffs' document request makes clear that a searching inquiry into the executive's formulation of the Policy is essential to their case. *See* footnote 20, *supra*.

decision altering its terms, for example, in Catholic or Moslem countries or countries where abortion is illegal. Moreover, Executive decisions as to foreign policy are usually not susceptible to the sort of rational explanation that lies at the heart of the judicial process. Such judgments frequently result from a "feel of the situation" derived from an "understanding" of political, economic and social circumstances and sensitivities within the affected countries. As Justice Jackson has written:

> Such decisions are confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex and involve large elements of prophesy. They are and should be undertaken only by those responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry. [citations omitted].

*Chicago and Southern Airlines*, 333 U.S. at 111, 68 S.Ct. at 436.

Finally, any pronouncement by the Court that differed with the Executive on these foreign policy questions would undermine the credibility and effectiveness of the Executive Branch in its handling of this delicate foreign relations issue. Such a pronouncement would create the "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710.[23]

The Court's view of this case receives support from the decision of the Second Circuit Court of Appeals in *DaCosta v. Laird*, 471 F.2d 1146 (2d Cir.1973), holding non-justiciable an inquiry into the propriety of the President's foreign affairs decision in May, 1972 to increase military activity against North Vietnam. Noting that it lacked the informational resources "to assess the nature of battlefield decisions," *DaCosta*, 471 F.2d at 1155, Judge Kaufman's opinion voiced his perplexity as to "how a court may decide a question when there are no judicially manageable standards for resolving it." *Id.* at 1153. *See also Holtzman v. Schlesinger*, 484 F.2d 1307, 1310 (2d Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974) ("We are not privy to the information supplied to the Executive by his professional and military diplomatic advisers and even if we were, we are hardly competent to evaluate it.") "The proper response in such situations is not to 'assume' the truth of the facts, but candidly to recognize that the court is incapable of assessing the facts and that the issue is therefore non-justiciable." *DaCosta*, 471 F.2d at 1155. This Court is similarly at a loss to see how it could obtain the relevant information upon which to act to resolve the foreign policy issues relating to the use of abortions in third world family planning. *See Crockett v. Reagan*, 558 F.Supp. 893, 898 (D.D.C.1982), *aff'd*, 720 F.2d 1355 (D.C.Cir. 1983).

Also highly persuasive is the decision of Judge Edelstein in *Greenham Women Against Cruise Missiles v. Reagan*, 591 F.Supp. 1332 (S.D.N.Y.1984), *aff'd*, 755 F.2d 34 (2d Cir.1985). In *Greenham Women*, plaintiffs sued to enjoin the deployment of cruise missiles at a United States Air Force Base in Greenham Common, Great Britain. Plaintiffs claimed infringement of constitutional rights under the Fifth and Ninth Amendments. The Court concluded that the case presented a non-justiciable political question because determination of

---

**23.** In *DKT Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C. Cir.1987), the Court of Appeals for the District of Columbia read a complaint apparently similar to the one at bar and determined that it presented a justiciable "challenge [to] the legality of AID's implementation of the policy." *DKT Memorial Fund*, 810 F.2d at 1236. The discussion of the issue in a single paragraph of Judge Mikva's opinion sheds little light on contours of the complaint filed in that case. However, because the court relied solely upon *Population Institute v. McPherson*, 797 F.2d 1062 (D.C.Cir. 1986), it appears that the court considered the *DKT Memorial Fund* case to be confined to the question of the AID administrator's statutory and administrative authority to act. In any event, this Court is not bound by *DKT Memorial Fund* and does not find it to be persuasive authority.

the rights at issue would require the Court to evaluate the effect of cruise missile deployment on the foreign policy objectives of the United States. In language that, with slight modification, applies to this case, the court said:

> Undoubtedly it can be said that the President and Congress cannot "know" with an absolute degree of certainty the effects of missile deployment. But it is precisely because the ultimate effects are not altogether knowable that conjecture and predictions about them are best left to the political branches of government. Questions that are infinitely more complicated than those posed by the question "how many angels can dance on the head of a pin?" are not ready for ready answers. Questions like how to ensure peace, how to promote prosperity, what is a fair utilization and distribution of economic resources are examples of questions that must be decided by the fair, sound, seasoned and mature judgments of men and women responsive to the common good. The power to make these determinations is therefore appropriately allocated to the political branches.

*Id.* at 1338.

Impermissible judicial encroachment upon the power of the political branches can occur not only from the *act of resolving* a question whose nature is political, but also from the *consequences* that flow from judicial action. *Baker v. Carr* makes clear that the "discriminating analysis" to be utilized by courts where questions touch upon foreign relations is not confined to considerations relating to "the history of its management by the political branches" and "its susceptibility to judicial handling," but also encompasses "the possible consequences of judicial action." 369 U.S. at 211–12, 82 S.Ct. at 707. Just as a court must refrain from resolving a question whose nature is political, so must it refrain from adjudicating a claim where the relief sought would impermissibly intrude on the independence of the political branches.

The principal relief sought in this case is a declaratory judgment that AID's "policy of requiring that recipients of AID family planning funds agree to the limits of the Clause is invalid and unenforceable" (Comp. p. 32). Such relief would nullify AID's implementation and enforcement mechanism for the Mexico City Policy and render wholly unenforceable the foreign policy determination itself. It would amount to a ruling by this Court requiring the Executive to render financial assistance abroad to applicants whose activities are squarely in opposition to the announced foreign policy of the United States. A more direct or inappropriate interjection of the Court into the foreign policy function of the Executive can hardly be envisioned. *See Greenham Women,* 591 F.Supp. at 1339 ("It is difficult to imagine how the United States could influence the policies of foreign governments through diplomatic means if the actions of the political branches could be subject to public review and rejection by United States courts.")

Plaintiffs' reliance on cases where the Supreme Court and lower courts have reached the merits of issues touching upon the foreign affairs function of the political branches does not compel a conclusion of justiciability in this one. To be sure, the plaintiffs in these cases sought to vindicate individual rights that were affected by a decision connected to the foreign affairs function. However, in none of them did the court's inquiry necessitate a review of the merits of the foreign policy decision of the Executive or request relief that would nullify it. In each case, there were "judicially manageable standards" applicable to the specific determinations necessary to resolve the issues presented.

*Ramirez de Arellano v. Weinberger,* 745 F.2d 1500 (D.C.Cir.1984), *vacated and remanded on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255, *aff'd per curiam,* 788 F.2d 762 (D.C.Cir.1986) casts this distinction in sharp relief. Ramirez, the owner of a large cattle ranch in Honduras, challenged the occupation and destruction of his ranch by the United States during military maneuvers. He sought injunctive and declaratory relief, alleging that no statute or Constitutional provision authorized this action and, in addition, it violated

**550**

his due process rights. The court concluded that Ramirez had presented a justiciable claim because he did not "seek to adjudicate the lawfulness of United States military presence abroad" but rather the "narrow issue whether the United States defendants may run military exercises through the plaintiff's private pastures when their land has not been lawfully expropriated." *Ramirez,* 745 F.2d at 1512. Thus, the factual issues presented in *Ramirez,* unlike those raised in this case, were of the type traditionally adjudicated in the courts. *See Olegario,* 629 F.2d at 217. For similar cases, *see also Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *Regan v. Wald,* 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984); *Lamont v. Postmaster General of the United States,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) and *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Plaintiffs in this case have not confined their complaint to a "narrow issue" dealing with individual rights but have mounted a broad challenge seeking the annulment of Presidential foreign policy which is beyond the competence of the Court to determine.

### Conclusion

The defendants are acting within their statutory and administrative authority in requiring recipients of foreign assistance for family planning to agree to the limits of the Standard Clause to the effect that no such funds may be furnished to foreign non-governmental organizations that perform or actively promote abortion as a method of family planning. The constitutional claims of plaintiffs are non-justiciable. It is unnecessary for this Court to consider whether the plaintiffs or any of them lack standing to maintain the action.

Defendants' motion to dismiss the complaint is hereby granted.

SO ORDERED.