838 F.2d 649
 PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., Planned
Parenthood Center of El Paso, Stewart R. Mott, Stephen L.
Isaacs, Sosamma Lindsay and Rebecca Ramos, on behalf of
themselves and others similarly situated, and Jane Doe, on
behalf of herself and others similarly situated, Plaintiffs-Appellants,
v.
AGENCY FOR INTERNATIONAL DEVELOPMENT, and M. Peter
McPherson, as Administrator of the Agency for
International Development, Defendants-Appellees.
 No. 551, Docket 87-6246.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 4, 1987.
Decided Jan. 29, 1988.
 
 Roger K. Evans, New York City (Eve W. Paul, Dara Klassel, Planned Parenthood Federation of America, New York City, Walter Slocombe, Geoffrey Judd Vitt, Julia L. Porter, Caplin & Drysdale, Washington, D.C., of counsel), for plaintiffs-appellants.
 Carolyn L. Simpson, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., Steven E. Obus, Asst. U.S. Atty., of counsel), for defendants-appellees.
 Janet Benshoof, Rachael Pine, Lynn Paltrow, Dawn Johnsen, American Civil Liberties Union, New York City, filed a brief for amici curiae American Civil Liberties Union, New York Civil Liberties Union, Fund for Free Expression, Professional Rights Comm. of American Society of Journalists and Authors, Inc., and New York Academy of Sciences.
 Before TIMBERS and MINER, Circuit Judges, and LASKER, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Planned Parenthood Federation of America, Inc. ("Planned Parenthood"), Planned Parenthood Center of El Paso, Stewart R. Mott, Stephen L. Isaacs, Sosamma Lindsay, Rebecca Ramos and Jane Doe, on behalf of themselves and others similarly situated, appeal from an order entered in the United States District Court for the Southern District of New York (Walker, J.) granting the motion of defendants-appellees Agency for International Development ("AID") and M. Peter McPherson, as Administrator of AID, to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). 670 F.Supp. 538. Appellants challenge the lawfulness of AID's implementation, via clause provisions inserted in family planning grants and cooperative agreements ("Standard Clause"), of the Policy Statement of the United States of America (the "Statement"), which was delivered in August 1984 at the United Nations International Conference on Population in Mexico City. Appellants assert that 1) defendants' actions violate the terms of, and exceed the authority granted by, the Foreign Assistance Act of 1961, 22 U.S.C. Sec. 2151 et seq. (1982 & Supp. III 1985), and 2) the Standard Clause imposes impermissible restrictions, as a condition of receiving federal funds, on appellants' first amendment right to speak about and advocate the availability and benefits of abortion and to associate with foreign persons and entities for purposes of such speech and advocacy. In addition, Planned Parenthood claims that the Standard Clause violates its first amendment rights by requiring it to espouse, circulate and enforce views with which it does not agree.
 
 
 2
 The district court granted defendants' motion to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), finding that 1) the Statement and Standard Clause are within defendants' statutory and administrative authority, and 2) appellants' first amendment claims present non-justiciable political questions.
 
 
 3
 We agree that defendants acted within their statutory and administrative authority; however, we conclude that the first amendment claims do not present non-justiciable political questions. Therefore, we affirm in part, reverse in part and remand this action to the district court for adjudication of appellants' first amendment claims.
 
 BACKGROUND
 
 4
 The Foreign Assistance Act of 1961, 22 U.S.C. Sec. 2151 et seq. (1982 & Supp. III 1985), authorizes foreign assistance for, inter alia, voluntary population planning "[i]n order to increase the opportunities and motivation for family planning and to reduce the rate of population growth." 22 U.S.C. Sec. 2151b(b). The Act grants the President the authority to provide this assistance "on such terms and conditions as he may determine." Id. Presidential discretion is not entirely unfettered, however, for the Act prohibits the use of federal money for, inter alia, "the performance of abortions as a method of family planning, or to motivate or coerce any person to practice abortions," or biomedical research relating to abortion as a means of family planning. Id. Sec. 2151b(f)(1), (3). The President has delegated his section 2151b(b) discretionary authority to the Director of the United States International Development and Cooperation Agency, Exec. Order No. 12,163, 44 Fed.Reg. 56,673 (1979), who, in turn, has delegated that authority to the Administrator of AID, IDCA Delegation No. 1, 44 Fed.Reg. 57,521 (1979), as amended, 45 Fed.Reg. 74,090 (1980).
 
 
 5
 In August 1984, a United States delegation to the United Nations International Conference on Population in Mexico City presented the "Policy Statement of the United States of America," issued by the White House on July 13, 1984, which commits the United States to withhold federal assistance from foreign nongovernmental organizations ("NGOs") that perform or actively promote abortions, even if those activities are financed with non-federal funds. The Statement provides, in pertinent part:
 
 
 6
 [T]he United States does not consider abortion an acceptable element of family planning programs and will no longer contribute to those of which it is a part. Accordingly, when dealing with nations which support abortion with funds not provided by the United States Government, the United States will contribute to such nations through segregated accounts which cannot be used for abortion. Moreover, the United States will no longer contribute to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations....
 
 
 7
 U.S. Government authorities will immediately begin negotiations to implement the above policies with the appropriate governments and organizations.
 
 
 8
 At the time the Statement was presented, foreign NGOs were prohibited by 22 U.S.C. Sec. 2151b(f) from using federal funds to finance abortion-related activities, but otherwise were not prohibited from engaging in those activities.
 
 
 9
 Following the presentation of the Statement, AID drafted the Standard Clause, which contains new eligibility provisions for foreign NGOs, for inclusion in family planning grants and cooperative agreements. AID administers the voluntary population planning program, in part, by entering into cooperative agreements with domestic and foreign NGOs, which, in turn, subgrant the federal funds to foreign family planning organizations that provide direct services to individuals. The Standard Clause requires every foreign NGO that receives federal family planning funds to "certify in writing that it does not perform or actively promote abortion as a method of family planning in AID-recipient countries and does not provide financial support to any other foreign NGO that conducts such activities." The Standard Clause defines "actively promot[ing] abortion" to include, inter alia, "providing advice and information regarding the benefits and availability of abortion," "encouraging abortion," and "[l]obbying a foreign government to legalize or make available abortion." Domestic NGOs that receive federal family planning grants must agree, as a condition of receipt, that they "will not furnish assistance under th[e] grant" to foreign NGOs that perform or "actively promote" abortion-related activities.
 
 
 10
 Planned Parenthood, a domestic NGO, has been a major recipient of federal family planning funds since 1971. In 1986, Planned Parenthood received $17.7 million from AID and distributed abroad over $13 million worth of AID-provided medical equipment and supplies and educational materials. Planned Parenthood assists 103 family planning organizations in 29 countries and finances these activities largely with AID family planning funds. Planned Parenthood's most recent cooperative agreement with AID, which was signed in May 1983, expired on December 31, 1987. AID officials have informed Planned Parenthood that when its cooperative agreement comes up for renewal in 1988, AID will renew federal assistance when Planned Parenthood signs an agreement containing the Standard Clause.
 
 
 11
 Appellant Lindsay is Dean of the College of Nursing of the University of East Africa in Barroton, Kenya; the University is an AID recipient. Lindsay's curriculum at the College of Nursing includes teaching about abortion in accordance with her personal views and the ethics of the nursing profession. Appellant Isaacs is the Director of the Development Law and Policy Program of the Center for Population and Family Health at Columbia University; Isaacs intends to assist foreign public policy groups, many of which receive AID funds, on studies of their nations' abortion laws and the effects of illegal abortions. Isaacs plans to work with those groups toward the reform of restrictive abortion laws by lobbying and public information efforts in their countries. Appellant Ramos is Director of Research and Special Projects of a private organization in Mexico that receives AID funds, and he often speaks on the subject of abortion. Appellant Mott works with organizations, including Planned Parenthood, to ensure that women in less developed countries may choose to have a safe, legal abortion. Appellant Doe is a patient in a medical center in Nigeria that receives AID funds, and who relies on that hospital for gynecological and obstetric advice and care. All of the individual plaintiffs are United States citizens.
 
 
 12
 In January 1987, Planned Parenthood and the other plaintiffs-appellants brought this action, on behalf of themselves and others similarly situated, seeking 1) a declaration that the AID requirement that recipients of federal family planning funds agree not to perform or actively promote abortions is invalid and unenforceable; 2) an injunction barring AID's use of the Standard Clause as a condition to family planning funds; and 3) an injunction requiring AID to consider Planned Parenthood's application for family planning funds without regard to its position on abortion. Appellants contend that the Statement is inconsistent with 22 U.S.C. Secs. 2151(a)[1] and 2151u(a)[2] and, therefore, the President lacks the authority to adopt and implement the Statement. Appellants also assert that when Congress prohibited the use of federal funds for certain abortion-related activities, see 22 U.S.C. Sec. 2151b(f)(1), (3), it precluded the imposition of restrictions on non-federal funds in the area of abortion-related activities.
 
 
 13
 Defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) on the grounds that the statutory claims are meritless, and that the constitutional claims present non-justiciable political questions and cannot be raised by appellants for lack of standing.
 
 
 14
 On the statutory claims, the district court held that neither section 2151(a) nor section 2151u(a) limits the President's section 2151b(b) discretion to refuse United States support for foreign NGOs that engage in abortion-related activities, noting, inter alia, that "absent a specific limitation on the Executive's authority to condition dispersal of United States funds to foreign NGOs, it must be assumed that Congress has left intact his discretion to refuse to do so." Planned Parenthood Federation of America, Inc. v. AID, 670 F.Supp. 538, 544 (S.D.N.Y.1987). The court also pointed to Congress' reaction following the issuance of the Statement. In 1984, the House of Representatives adopted a "Sense of the House" condemning the Statement, see Foreign Assistance and Related Programs Appropriations Act for fiscal year 1985, Pub.L. No. 98-473, 98 Stat. 1884, 1888 (1984). A year later, the House adopted an amendment endorsing the Statement, see 131 Cong.Rec. H5348-H5355 (daily ed., July 10, 1985). Meanwhile, the Senate adopted an amendment prohibiting the implementation of the Statement, see S.Rep. No. 34, 99th Cong., 1st Sess. 32 (1985), reprinted in 1985 U.S.Code Cong. & Admin.News 158, 191. Later, both amendments were withdrawn as a compromise to the disparate House and Senate positions, see H.Conf.Rep. No. 237, 99th Cong., 1st Sess. 118 (1985), reprinted in 1985 U.S.Code Cong. & Admin.News 210, 227. The district court concluded that Congress' inaction "left intact" the President's broad discretionary authority and dismissed the statutory claims for failure to state a claim upon which relief could be granted.
 
 
 15
 On the constitutional claims, the district court acknowledged that "plaintiffs have drafted [the complaint] as a challenge to the AID Standard Clause and claim that the Clause infringes their [f]irst [a]mendment and privacy rights," 670 F.Supp. at 546, but determined that the claims are non-justiciable nevertheless because they are "targeted not merely at a method or means of implementation of a foreign policy, but at the foreign policy itself," id. at 547. The district court expressed its belief that it lacked "judicially discoverable and manageable standards," id. (citing Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)) to resolve this action, because it determined that, in order to do so, it must weigh the merits and wisdom of the policy goals articulated by the Statement and must obtain the relevant information with which to "resolve the foreign policy issues relating to the use of abortions in third world family planning," id. at 547-48. The court observed that any pronouncement by it that differed with the President on these "foreign policy questions" would create the "potentiality of embarrassment from multifarious pronouncements by various departments on one question," id. at 548 (citing Baker, 369 U.S. at 217, 82 S.Ct. at 710), and found that the relief sought by appellants would "render wholly unenforceable the foreign policy determination itself and would amount to a ruling ... requiring the Executive to render financial assistance abroad to applicants whose activities are squarely in opposition to the announced foreign policy of the United States," id. at 549. The district court concluded that appellants' constitutional claims present non-justiciable political questions and dismissed them accordingly.
 
 DISCUSSION
 Statutory Claims
 
 16
 Appellants' contention that the Act prohibits the implementation of the Statement via the Standard Clause is without merit. It is a well-established rule of statutory interpretation that "[i]f Congress has directly spoken to the precise issue in question, if the intent of Congress is clear, that is the end of the matter." Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166 (1986). On the other hand, when a court reviews an agency's construction of a statute which it administers and "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Chevron, USA v. Natural Resources Defense, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). We agree with the district court's determination that the Statement and the Standard Clause are within defendants' section 2151b(b) authority and that neither contradicts the terms of sections 2151(a), 2151u(a) or 2151b(f) of Title 22.
 
 
 17
 Section 2151(a) declares that "a principle objective of the foreign policy of the United States" is to aid developing countries in their efforts to acquire "the knowledge and resources essential to development." However, as we have previously acknowledged, section 2151(a) does not require AID to assist all family planning projects that apply for federal funds, and AID has "broad discretionary power" to decide which, among numerous competing projects, will be given family planning funds. See Alan Guttmacher Institute v. McPherson, 616 F.Supp. 195, 207 (S.D.N.Y.1985), aff'd, 805 F.2d 1088 (2d Cir.1986). Therefore, the fact that AID has adopted and implemented a policy which withholds federal support to organizations that engage in abortion-related activities does not violate the terms of section 2151(a).
 
 
 18
 Appellants next argue that the Statement and Standard Clause contradict section 2151u(a). Section 2151u(a) affirms the United States' commitment to assist private and voluntary organizations in their efforts to further development overseas and provides that "it is in the interest of the United States that such organizations and cooperatives expand their overseas development efforts without compromising their private and independent nature." Although section 2151u(a) refers to the United States' "interest" in private organizations, it does not contain any mandatory language. Indeed, according to its terms, the Government may choose not to use private organizations at all. While section 2151u(a) might be interpreted to prohibit AID's entanglement in the day-to-day administration of a foreign NGO or an AID requirement that an organization affirmatively espouse a certain viewpoint, appellants make no allegations of this sort. At most, section 2151u(a) requires only that the Government consider the private and independent nature of private organizations which it utilizes. We are mindful of the broad grant of authority accorded to the President by section 2151b(b) and, without any language limiting the President's authority in his use of private organizations, we cannot say that section 2151u(a) has been violated.
 
 
 19
 The only limitation that Congress placed upon the President's discretionary authority is set forth in section 2151b(f). Section 2151b(f) prohibits the use of federal funds for certain abortion-related activities, including the performance of abortions as a method of family planning. Appellants assert that when Congress adopted section 2151b(f), Congress specifically addressed the issue of whether limitations should be imposed on the use of non-federal funds for abortion-related activities, and, therefore, the President cannot impose additional limitations relative to that issue. We cannot agree. A flaw in appellants' argument is that section 2151b(f) is a limitation on the use of federal funds, not on non-federal funds. Appellants might have a meritorious argument if Congress had affirmatively rejected a provision similar to the Statement and Standard Clause in favor of section 2151b(f); in fact, the Congress that enacted section 2151b(f) never considered such a provision. The language that appellants point to:
 
 
 20
 We could, in fact, go far beyond the present amendment and require all abortion activities, from whatever funds, to be stopped before our assistance could be received. But the present amendment does not do that.
 
 
 21
 119 Cong.Rec. S32292-93 (daily ed., Oct. 1, 1973) (statement of Sen. Helms), does not indicate that Congress "has spoken" on the issue of whether limitations may be imposed on the use of non-federal funds. At most, Sen. Helms' statement indicates that Congress was aware that it could consider an amendment containing such limitations on non-federal funds, not that Congress considered, but chose not to adopt, such limitations. Thus, we must conclude that the Congress which enacted section 2151b(f) never addressed the issue of limitations on non-federal funds. In addition, we agree with appellants that Congress' mixed reaction to the Statement amounted to no more than "congressional inaction," see, e.g., Johnson v. Transportation Agency, --- U.S. ----, 107 S.Ct. 1442, 1472-73, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting) (noting that subsequent congressional inaction may not represent approval of status quo), leaving the issue of whether limitations may be imposed on non-federal funds to be resolved in light of the intent, if any, of the Congress that enacted section 2151b(f). As we have discussed above, Congress has not evidenced any intent on this issue; therefore, we agree with the district court that "absent a specific limitation on the Executive's authority to condition dispersal of United States funds to foreign NGOs, it must be assumed that Congress has left intact" the President's discretion to place conditions upon or refuse funding to such organizations, Planned Parenthood, 670 F.Supp. at 544.
 
 Political Question
 
 22
 In determining whether a case presents a non-justiciable political question, the court must first make a "discriminating inquiry into the precise facts and posture of the particular case." Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (quoted in Olegario v. United States, 629 F.2d 204, 217 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981)). The fact that this case involves foreign affairs, an area constitutionally committed to the executive and legislative branches, does not end the court's inquiry as to whether the action presents a political question, Olegario, 629 F.2d at 217, for "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," Baker, 369 U.S. at 211, 82 S.Ct. at 707.
 
 
 23
 Here, the district court acknowledged that appellants drafted the complaint "as a challenge to the AID Standard Clause and claim that the Clause infringes their [f]irst [a]mendment and privacy rights," Planned Parenthood, 670 F.Supp. at 546. Despite the district court's recognition that the "precise issue" in this case is the constitutionality of the Standard Clause, the court held that none of appellants' constitutional claims present justiciable controversies because the complaint is "targeted not merely at a method or means of implementation of a foreign policy, but at the foreign policy itself," id. at 547. While the complaint may contain non-justiciable attacks on the Statement, that alone does not place appellants' challenge to the Standard Clause beyond judicial cognizance. After examining the "precise issue" identified by the district court, we conclude that it does not present a non-justiciable political question.
 
 
 24
 While courts are not competent to formulate national policy or to review controversies which "revolve around policy choices and value determinations constitutionally committed" to Congress or the executive branch, Japan Whaling Ass'n, 106 S.Ct. at 2866, it is a court's duty to determine whether the political branches, in exercising their powers, have "chosen a constitutionally permissible means of implementing that power," INS v. Chadha, 462 U.S. 919, 940-43, 103 S.Ct. 2764, 2778-80, 77 L.Ed.2d 317 (1983). In this action, appellants contend that the Standard Clause is an unconstitutional means of implementing AID's policies. AID asserts that both the Statement and the Standard Clause embody U.S. foreign policy, and therefore are both immune from judicial review. We cannot agree with AID's position. Assuming that the Statement declares a foreign or national policy that the United States "will no longer contribute to ... organizations which perform or actively promote abortion," it does not follow that requiring appellants to agree to allegedly unconstitutional limitations on their free speech is also foreign or national policy. Nor can AID transform the Standard Clause into foreign policy simply by affixing the label "foreign policy," see Baker, 369 U.S. at 217, 82 S.Ct. at 710 (noting "the impossibility of resolution by any semantic cataloguing"). Therefore, we hold that appellants' constitutional claims "challenge the legality of AID's implementation of the [Statement]," DKT Memorial Fund, Ltd. v. AID, 810 F.2d 1236, 1238 (D.C.Cir.1987) (emphasis supplied), and do not require the court to pass upon the "political and social wisdom of AID's foreign policy," id. We observe that if Planned Parenthood's challenge were successful, the Statement could be implemented in a number of alternative ways without compromising AID's policy, such as contributing to NGOs through segregated accounts, as AID does in its government-to-government dealings.
 
 
 25
 Finally, we cannot agree with the district court that this case presents "a lack of judicially discoverable and manageable standards," and "the potentiality of embarrassment from multifarious pronouncements," Baker, 369 U.S. at 217, 82 S.Ct. at 710. The district court's analysis was premised on the erroneous assumption that this case requires an evaluation of the policies articulated in the Statement. As discussed above, it is not necessary for the court to attempt such an endeavor. Appellants' constitutional challenge to the Standard Clause merely requires the court to apply well-established principles of First Amendment jurisprudence, an area traditionally vested in the federal courts, see Elrod v. Burns, 427 U.S. 347, 351-52, 96 S.Ct. 2673, 2678-79, 49 L.Ed.2d 547 (1976); Powell v. McCormack, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1969). Thus, there is no lack of judicially discoverable or manageable standards. Nor is there any potentiality of embarrassment from multifarious pronouncements: It is the responsibility of the courts "to act as the ultimate interpreter of the Constitution," Powell, 395 U.S. at 549, 89 S.Ct. at 1978, and the judiciary "cannot shirk [its constitutional] responsibilit[ies] merely because [a] decision may have significant political overtones," Japan Whaling Ass'n, 106 S.Ct. at 2866.
 
 CONCLUSION
 
 26
 Based on the foregoing, we affirm in part, reverse in part, and remand this action to the district court for adjudication of the constitutional claims. The mandate shall issue forthwith.
 
 
 
 *
 Hon. Morris E. Lasker, United States District Judge, Southern District of New York, sitting by designation
 
 
 [1]
 22 U.S.C. Sec. 2151(a) provides in pertinent part:
 [T]he Congress declares that a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions which will improve the quality of their lives.
 
 
 [2]
 22 U.S.C. Sec. 2151u(a) provides:
 The Congress finds that the participation of rural and urban poor people in their countries' development can be assisted and accelerated in an effective manner through an increase in activities planned and carried out by private and voluntary organizations and cooperatives. Such organizations and cooperatives, embodying the American spirit of self-help and assistance to others to improve their lives and incomes, constitute an important means of mobilizing private American financial and human resources to benefit poor people in developing countries. The Congress declares that it is in the interest of the United States that such organizations and cooperatives expand their overseas development efforts without compromising their private and independent nature. The Congress further declares that the financial resources of such organizations and cooperatives should be supplemented by the contribution of public funds for the purpose of undertaking development activities in accordance with the principles set forth in section 2151-1 of this title and, if necessary and determined on a case-by-case basis, for the purpose of sharing the cost of developing programs related to such activities. The Congress urges the Administrator of the agency primarily responsible for administering this subchapter, in implementing programs authorized under this subchapter, to draw on the resource of private and voluntary organizations and cooperatives to plan and carry out development activities and to establish simplified procedures for the development and approval of programs to be carried out by such private and voluntary organizations and cooperatives as have demonstrated a capacity to undertake effective development activities.