**GAY MEN'S HEALTH CRISIS, Hetrick Martin Institute, Horizons Community Services, San Antonio Tavern Guild Aids Foundation, The Fund for Human Dignity, and The State of New York and the New York State Department of Health, Plaintiffs,**

v.

**Dr. Louis SULLIVAN or his Successor, Secretary of Health and Human Services; and James O. Mason or his Successor, Director of the U.S. Centers for Disease Control, Defendants.**

**No. 88 Civ. 7482 (SWK).**

United States District Court, S.D. New York.

Dec. 14, 1989.

620

American Civil Liberties Union Foundation by Nan D. Hunter, Judith Levin, William B. Rubenstein, Center for Constitutional Rights by David Cole, Robert Abrams, Atty. Gen. of the State of N.Y. by Debra Marcus, Florence Wiener, Judith Kramer, New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Steven C. Bennett, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action was brought by several organizational and governmental plaintiffs involved in the education of homosexual men and other persons about Acquired Immunodeficiency Syndrome ("AIDS"). Plaintiffs, seeking declaratory and injunctive relief, challenge the constitutionality of statutory and agency restrictions on federally-funded AIDS education materials and activities. Defendants have moved for dismissal of the complaint pursuant to Fed.R.Civ.P. 12(b)(6), or, in the alternative, for summary

judgment pursuant to Fed.R.Civ.P. 56, and for stay of discovery. Plaintiffs have cross-moved for partial summary judgment.

## BACKGROUND

These facts are adopted in part from defendants' and plaintiffs' statements of facts provided pursuant to local rule 3(g).[1]

AIDS is the final stage of infection with the human immunodeficiency virus ("HIV"), the virus which causes AIDS. Plaintiff's 3(g) statement, ¶ 1. The virus is transmitted by introduction into the bloodstream which may occur during sexual activity or intravenous drug use. *Id.* Persons who have AIDS are vulnerable to opportunistic diseases including pneumocystic carinii pneumonia, a rare form of pneumonia, and Kaposi's sarcoma, a form of cancer. Fauci, NIH Conference—The Acquired Immunodeficiency Syndrome: An Update, 102 Annals of Internal Med. 800, 802 (1985) (cited in Weiss, AIDS: Balancing the Physicians' Duty to Warn and Confidentiality Concerns, 38 Emory L.J. 279 n. 12 (1989)). Other symptoms include fever, fatigue, loss of weight and appetite, swollen glands, night sweats, and diarrhea. Surgeon General's Report on AIDS, 102 Public Health Reports 11 (Supp.1987) (cited in Weiss, *supra,* n. 13.)

AIDS was first reported as a new disease by the Centers for Disease Control in the summer of 1981. Weiss, *supra,* at 284; *see also,* Defendant's First Memorandum of Law in Support of Motion to Dismiss, or, in the Alternative, for Summary Judgment, and for Stay of Discovery ("Def.Mem. I") at 2. As of mid-January, 1989, more than 84,000 cases of AIDS had been reported in the United States, more than 20,000 of which were in the State of New York. Public health officials estimate that be-

1. Local rule 3(g) states that the party moving for summary judgment shall annex to the motion papers

"a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried....

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to

which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

All 3(g) statements relied on herein have been deemed admitted by opposing counsel unless otherwise noted.

tween one and two million Americans are infected with HIV. Plaintiff's 3(g) statement, ¶ 2. Currently, 61.7% of American adults with AIDS are homosexual or bisexual men. CDC, *AIDS Weekly Surveillance Report* (January 16, 1989) at 3 (cited in Plaintiff's First Amended Complaint, ¶ 16). The disease is regarded as "invariably fatal." Weiss, *supra,* 38 Emory L.J. at 280 (cite omitted).

The Parties

Organizational plaintiffs Gay Men's Health Crisis ("GMHC"), Hetrick Martin Institute for the Protection of Gay and Lesbian Youth ("Hetrick Martin"), Horizons Community Services ("Horizons"), San Antonio Tavern Guild AIDS Foundation ("Tavern Guild"), and the Fund for Human Dignity ("FHD") are non-profit organizations which conduct AIDS education programs with a particular focus on the gay male population. These organizations have sought or allegedly would seek funding from defendant Centers for Disease Control ("CDC"), an agency of the United States government, for their AIDS education activities. Plaintiffs' First Amended Complaint, ¶¶ 5–9. State plaintiff New York State is suing *parens patriae.* New York State and its agency, the New York State Department of Health ("DOH"), receive funding from CDC for AIDS education and prevention services. New York's DOH is a direct grant recipient of CDC funding and in turn serves as a subgrantor of funds to various community groups providing AIDS education and prevention services. *Id.* at ¶¶ 11–12.

Defendant Dr. Louis W. Sullivan is the U.S. Secretary of Health and Human Services. Defendant James O. Mason is the Director of the Centers for Disease Control. The persons in these two capacities are responsible for "mak[ing] grants to public and nonprofit private entities for information and education programs on and for the ... prevention and control of, acquired immune deficiency syndrome." 42 U.S.C. § 247c(d) (1988 Supp.).

The Regulations and Statutory Amendments

By July of 1985, CDC had become a significant source of funding for communi-ty-based AIDS prevention programs. Def. Mem. I at 2. Up to and including that time, CDC imposed no restrictions upon the sexual explicitness of AIDS educational materials funded by it. *See, e.g.,* 50 Fed. Reg. 30298 (July 25, 1985) (notice of availability of funds) (cited in Def.Mem. I at 2). However, in January of 1986, responding to "concerns over the explicit content of some of the proposed written and audiovisual materials," the CDC developed guidelines for the content of AIDS educational materials to be funded through the CDC. Letter from Donald A. Berreth, Director, Office of Public Affairs, CDC, dated May 28, 1987, attached as Exhibit K to Declaration of Michael Quadland in support of Plaintiff's motion for partial summary judgment. Those guidelines, or "grant terms," were published in a document called "Basic Principles," and provided that:

(a) [l]anguage used in written materials ... should use terms or descriptors necessary for the target audience to understand the messages.

(b) Such terms or descriptors used should be those which a reasonable person would conclude should be understood by a broad cross-section of educated adults in society, or which when used to communicate with a specific group, such as gay men, about high risk sexual practices, would be judged by a reasonable person to be [i]noffensive to most educated adults beyond that group.

(c) The language of items in questionnaires or survey instruments which will be administered in any fashion to any persons should use terms to communicate the information needed which would be understood by a broad cross-section of educated adults in society but which a reasonable person would not judge to be offensive to such people.

(d) Audiovisual materials and pictorials in addition should communicate risk reduction messages by inference rather than through any display of the anogenital area of the body or overt depiction of the performance of "safer sex" or "unsafe sex" practices.

(e) Educational group sessions of any size should avoid activities in which attendees participate in sexually suggestive physical contact or actual sexual practices.

51 Fed.Reg. 3427, 3431 (Jan. 27, 1986). The "bounds of explicitness" were to be considered on a project-by-project basis by local Project Review Panels (PRPs), which would review and approve all materials. *Id.*[2] Similar grant terms were attached to May 1986 and March 1987 CDC notices of availability of AIDS-related project funds.[3]

Plaintiff GMHC received funding for an AIDS risk reduction project during the fiscal years 1986 and 1987, and that funding was subject to the above grant terms. Defendants' 3(g) statement, ¶¶ 3–4.

In December of 1987, Congress passed an amendment (commonly known as the "Helms Amendment") to the Labor—Health and Human Services Appropriations Act for Fiscal Year 1988, P.L. No. 100–202. The Helms amendment curtailed the range of AIDS educational materials that could be produced with CDC funds by community-based gay men's organizations. It provided, *inter alia*, that federal funds should not be used to provide materials that "promote or encourage, directly, homosexual sexual activities." It also required CDC-funded materials to "emphasize abstinence from" extramarital sexual activity, "including ... homosexual sexual activities," and "abstinence from the use of illegal intravenous drugs." Further, it called for repayment by non-complying recipients of funds wrongfully used, and the curtailment of future disbursements to non-complying organizations or agencies.[4]

In February 1988, CDC announced the availability of fiscal year 1988 federal

2. The provision relating to program review panels read in part:

Prospective cooperative agreement recipients will be required to establish a program review panel.... This panel, guided by the CDC Basic Principles [in the previous section] in conjunction with prevailing community standards, will review and approve all written materials, pictorials, and audiovisuals, questionnaires or survey instruments, and proposed educational group session activities to be used under the project plan. This panel is intended to review materials only and should not be empowered either to evaluate the proposal as a whole or to replace any other internal review panel or procedure of the local governmental jurisdiction.

3. The May 1986 grant terms applied to counseling and testing programs, and omitted items (c) and (e), above, which did not apply to counseling. 51 Fed.Reg. 18500–05 (May 20, 1986); *see also* Def.Mem. I at 4–5. 51 FR 3427 (Jan. 27, 1986)

The March 1987 funds were earmarked for AIDS prevention projects, and the grant terms omitted, *inter alia*, part (d) relating to audiovisual materials. *See* 52 Fed.Reg. 7028 (March 6, 1987); *see also* Def.Mem. I at 5.

4. The Helms amendment read in its entirety:
(a) Notwithstanding the matter under the heading "CENTERS FOR DISEASE CONTROL," none of the funds made available under this Act to the Centers for Disease Control shall be used to provide AIDS education, information, or prevention materials and activities that promote or encourage, directly, homosexual sexual activities.
(b) Education, information, and prevention activities and materials paid for with funds appropriated under this Act shall emphasize—
(1) abstinence from sexual activity outside a sexually monogamous marriage (including abstinence from homosexual sexual activities) and
(2) abstinence from the use of illegal intravenous drugs.
(c) The homosexual activity referred to in subsections (a) and (b) includes any sexual activity between two or more males as described in Section 2256(2)(A) of Title 18, United States Code.
(d) The illegal drugs referred to in subsection (b) include any controlled substance as defined in Section 102(6) of the Controlled Substance Act (21 U.S.C. § 802(6)).
(e) If the Secretary of Health and Human Services finds that a recipient of funds under this Act has failed to comply with this section, the Secretary shall notify the recipient, if the funds are paid directly to the recipient, or notify the State if the recipient receives the funds from the State, of such finding and that—
(1) no further funds shall be provided to the recipient;
(2) no further funds shall be provided to the State with respect to non-compliance by the individual recipient;
(3) further payment shall be limited to those recipients not participating in such non-compliance; and
(4) the recipient shall repay to the United States, amounts found not to have been expended in accordance with this section.

funds for AIDS education and prevention projects. 53 Fed.Reg. 3553 (Feb. 5, 1988), as amended 53 Fed.Reg. 6034 (Feb. 29, 1988). These documents reiterated the CDC restrictions contained in sections (a), (b), (c), and (e) of the January 1986 announcements, *supra*, (with section (e) relettered as section (d)), and incorporated the Helms Amendment statutory restriction as the new section (e). 53 Fed.Reg. 6034–35.[5] It also repeated the provisions for Program Review Panels which had been required since January 1986. (*See, supra*, n. 2).

Plaintiff GMHC did not seek federal AIDS education funding for fiscal year 1988. It claims it was deterred from so doing by the Helms Amendment provisions. Declaration of Timothy Sweeney, Deputy Executive Director for Policy of GMHC, ¶ 4. Plaintiffs Hetrick Martin and FHD also have not sought CDC funded contracts to perform AIDS prevention education services; they, too, allege that they would apply and compete for such funds but for the challenged restrictions. Plaintiff's First Amended Complaint, ¶¶ 6, 9. Plaintiff Horizons has sought and received approximately $69,000 in fiscal year 1988 CDC AIDS education and prevention funds through the Chicago Department of Health. Those funds are restricted by the Helms Amendment provision as well as by the CDC grant terms. Horizons' contract runs from October 1, 1988 to September 30, 1989. Declaration of Bruce Koff, Executive Director of Horizons, ¶ 2. Plaintiff Tavern Guild receives fiscal year 1988 CDC AIDS education and prevention funds through the Texas Department of Health. That grant ran from February 1, 1988 to January 31, 1989,[6] and was similarly restricted by the Helms Amendment and CDC provisions. Declaration of Robert Edwards, Executive Director of San Antonio Tavern Guild AIDS Foundation, ¶ 2. Plaintiff New York State Department of Health alleges that it has been unable to produce realistic educational material on AIDS which complies with the restrictions of the fiscal year 1988 statute. Affidavit of Frances Tarlton, Associate Director of the Public Affairs Group for the New York State Department of Health, ¶¶ 11–12.

In August and September of 1988, CDC announced the availability of grant funds for fiscal year 1989. *See* Announcement No. 904, 53 Fed.Reg. 30,099 (Aug. 10, 1988) (referring to approximate amounts of available funds and expected dates for making awards); Announcement No. 901, 53 Fed. Reg. 36,492, 36,493 (Sept. 20, 1988) (same) (cited in Def.Mem. II at 8). These announcements contained the same grant terms, including the Helms Amendment language, as for fiscal year 1988, and were based on Presidential budget figures and amounts appropriated in then-pending legislation before Congress. Declaration of

---

**5.** These terms, the "Basic Principles" of the original January 1986 announcement, retained that title as section (1) of the government document, *Content of AIDS-related Written Materials, Pictorials, Audiovisuals, Questionnaires, Survey Instruments, and Education Sessions (January 1988).* Subsection (e) of section (1) provides:

Messages which are part of any material or activities supported with CDC funds must be consistent with recently enacted Federal legislation (Pub.L. 100–202) [the Helms Amendment] which prohibits the use of CDC funds for '* * * AIDS education, information, or prevention materials and activities that promote or encourage, directly, homosexual sexual activities.' This legislation also directs that 'Education, information, and prevention activities and material * * * shall emphasize (1) abstinence from sexual activity outside a sexually monogamous marriage (including abstinence from homosexual sexual activities) and (2) abstinence from use of illegal intravenous drugs.'

The intent of Congress is further clarified in the Conference Report which accompanied Pub.L. 100–202. This report provides that the above language '* * * shall not be construed to prohibit descriptions of methods to reduce the risk of HIV transmission; to limit the eligibility for Federal funds of a grantee or potential grantee because of its non-Federally funded activities; nor shall it be construed to limit counseling or referrals to agencies that are not Federally funded.'

The *Surgeon General's Report on Acquired Immune Deficiency Syndrome* (October 1986) contains messages which are consistent with the provisions of this legislation.

**6.** Tavern Guild's contract has been renewed with a new grant of CDC funds until December 31, 1989. Plaintiff's Memorandum of Law in Reply to Defendants' Opposition to Partial Summary Judgment (hereinafter, "Plaintiff Mem. II"), at 3 n. 1.

John L. Williams, Director of the Procurement and Grants Office of the Centers for Disease Control, ¶¶ 6 and 8.

At or about the same time, Congress considered the Labor, Health and Human Services, and Education and Related Agencies Appropriations Bill for Fiscal Year 1989. It debated and ultimately adopted an amendment, commonly known as the "Kennedy/Cranston amendment," which changed the restrictions applicable to CDC-funded AIDS educational materials for fiscal year 1989. In contrast to the Helms amendment applicable to fiscal 1988 funding, the Kennedy/Cranston amendment prohibits the expenditure of funds only for programs that are "designed" to promote or encourage certain activities. It also includes restrictions on funding for programs that would promote or encourage, directly, "sexual activity, homosexual or heterosexual." Furthermore, it contains a proviso that AIDS education programs be designed to provide "accurate information" about exposure, transmission, and health risks related to the AIDS virus. P.L. No. 100–436.[7]

Subsequently, the CDC developed revised guidelines for fiscal year 1989 appropriations. These grant terms were identical to those applicable to 1988 appropriations except that they replaced the provision referring to the Helms amendment with a provision referring to the Kennedy/Cranston amendment. The new grant terms were incorporated into a CDC call for grant applications published in January, 1989. *See* 54 Fed.Reg. 663 (January 9, 1989).

Plaintiffs GMHC and Hetrick Martin Institute applied to CDC for fiscal year 1989 grant funds pursuant to the January 1989 notice. Defendants' 3(g) statement, ¶¶ 36–37.[8] Tavern Guild's 1988 contract has been renewed with a new grant of CDC funds until December 31, 1989; this renewal contract is presumably subject to the 1989 CDC restrictions. Plaintiff Mem. II at 3, n. 1. Plaintiff New York State Department of Health has received CDC funding for fiscal year 1989 and is subject to the 1989 grant terms. Plaintiff FHD has not sought CDC funding for the 1989 fiscal year, and claims that it was deterred from competing for such funds. Plaintiffs' 3(g) statement, ¶ 14. It is not clear from the briefing papers whether plaintiff Horizons has again applied for or received subgrants from the Chicago Department of Health for fiscal year 1989.

In their complaint in this action, which has been amended once, plaintiffs allege six causes of action: (1) the fiscal year 1989 CDC restrictions are inconsistent with and contrary to the fiscal year 1989 statute as amended by the Kennedy/Cranston amendment; (2) that the fiscal year 1988 statute on its face violates the first and fifth amendments to the United States Constitution; (3) defendants' application of the fiscal years 1988 and 1989 statutes violates the first and fifth amendments to the United States Constitution; (4) the fiscal years 1988 and 1989 CDC restrictions on their face violate the first and fifth amendments to the U.S. Constitution; (5) defendants' application of the fiscal years 1988 and 1989 CDC restrictions violates the first and fifth amendments to the United States Con-

---

**7.** The Kennedy/Cranston Amendment reads in full:

> At the end of the pending committee amendment [to the spending bill], add the following: 'Notwithstanding any other provision of this Act, AIDS education programs funded by the Centers for Disease Control and other education curricula funded under this Act dealing with sexual activity—
> (1) shall not be designed to promote or encourage, directly, intravenous drug abuse or sexual activity, homosexual or heterosexual, and
> (2) in addition, with regard to AIDS education programs and curricula—

> (A) shall be designed to reduce exposure to and transmission of the etiologic agent for acquired immune deficiency syndrome by providing accurate information, and
> (B) shall provide information on the health risks of promiscuous sexual activity and intravenous drug abuse.'

**8.** Admitted by plaintiffs, but plaintiffs further state that the terms of these applications were restricted by the challenged CDC grant terms. Plaintiffs' opposition to defendants' 3(g) statement, ¶ 37. The Court has since been notified that these applications were rejected.

stitution; and (6) the fiscal year 1988 statute violates the equal protection of the law guaranteed by the fifth amendment to the United States Constitution. Plaintiffs do not challenge the constitutionality of the Kennedy/Cranston amendment.

Plaintiffs contend that these restrictions "impede their ability to provide the most medically accurate and effective education about AIDS." Plaintiffs' First Amended Complaint ¶ 3. As a remedy, plaintiffs request a declaration that the challenged restrictions are unconstitutional and/or that they violate the applicable statute, an injunction of continued application of the challenged restrictions, and an award of costs and attorneys fees. Plaintiffs' First Amended Complaint at 20.

In the present motion, defendants move this Court for dismissal of the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, or in the alternative, for summary judgment under Fed.R.Civ.P. 56(b). Defendants contest plaintiffs' standing to bring this action. In addition, defendants deny each of plaintiffs' substantive claims. They assert that plaintiffs have "no right to receive federal funds to subsidize educational activities," that "the statute and grant terms ... both on their face, and as applied, do not violate plaintiffs' rights to equal protection and are not vague," and that there is "no inconsistency between the fiscal year 1989 statute and the current CDC grant terms." Def.Mem. I at 1–2; Def.Mem. II at 2. Defendants have also moved, pursuant to Fed.R.Civ.P. 26(c), for a stay of discovery pending decision on this dispositive motion. Def.Mem. I at 2; Def. Mem. II at 4.

Plaintiffs oppose defendants' motions for dismissal, summary judgment, and stay of discovery. In addition, plaintiffs cross-move for partial summary judgment pursuant to Fed.R.Civ.P. 56(a) on their first, second, fourth, and sixth causes of action.[9]

**DISCUSSION**

**I. Standing**

■ Standing doctrine derives from the "case or controversy" requirement found in Article III of the United States Constitution. In order to show standing, a potential claimant must demonstrate: (1) an actual or threatened injury, (2) which injury was allegedly caused by defendant's challenged action, and (3) which injury is remediable by action of the Court. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Ky. Welfare Rights*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). Defendants deny that plaintiffs have standing to challenge the statutory and regulatory scheme because, defendants contend, "none of the plaintiffs has alleged that it has personally suffered any actual or threatened injury to itself." Def.Mem. I at 23. Defendants contend that no plaintiff has ever been denied federal funds for any AIDS education program, nor has any plaintiff been explicitly directed by any Program Review Panel or by the CDC not to utilize any material. In fact, GMHC failed to apply for funds under the 1988 grant terms, and FHD has never applied for CDC funding. Moreover, defendants assert that no plaintiff would suffer any adverse consequences merely by presenting non-complying material to the Program Review Panels (PRPs). *Id.* at 23–24.

With respect to plaintiffs New York State and New York State Department of Health ("DOH"), defendants claim that a state may not maintain a *parens patriae* action against the federal government, and furthermore, that the governmental plaintiffs in this action can neither allege nor show any injury. Def.Mem. II at 18–20.

**9.** Plaintiffs concede that their "as applied" claims, counts three and five, require discovery and further factual development. Plaintiffs' Memorandum of Law in Support of Partial Summary Judgment and in Opposition to Defendants' Motion to Dismiss and for Stay of Discovery (hereinafter Mem. I), at 4.

In arguing for standing, plaintiffs point out that two plaintiff organizations, Horizons and Tavern Guild, applied for and received funding under the 1988 grant terms, i.e., the Helms amendment and the 1988 CDC regulations. Tavern Guild has also received fiscal 1989 funds under the Kennedy/Cranston and 1989 CDC regulations. Plaintiff New York State, through its agency DOH, has also received both 1988 and 1989 funds. Moreover, plaintiffs who are non-recipients of 1988 and 1989 funds contend that they need not go through the motions of applying for grants and being denied in order to obtain standing if that process would be futile. Mem. II at 4–5. The organizational plaintiffs also indicate that they are suing on behalf of their clients and/or members, whom they claim are harmed by lack of "access to accurate and effective health information ..." Mem. I at 25–26.

As to New York State and the DOH, plaintiffs maintain that the State has an interest in (1) protecting the health and welfare of its residents; (2) applying lawful standards to programs to which it distributes CDC funds; (3) protecting itself against threatened financial injury as a result of losing future federal funding for AIDS prevention programs; and (4) protecting itself against threatened health and social costs stemming from an increase in the number of AIDS infections among New York citizens. *Id.* at 27–33. Defendants' restrictive funding policies harms those protectible interests, plaintiffs assert, and constitutes actual or threatened injury.

Defendants raise an interesting issue as to whether a party must first apply for, and be refused, federal funds before it can challenge the applicable funding statute. Recently, other cases have been presented in federal district courts involving the distribution of federal grant moneys under a certain language restriction. *See New York v. Bowen,* 690 F.Supp. 1261, 1263–64 (S.D.N.Y.1988), *aff'd,* 889 F.2d 401 (2d Cir. 1988), *cert. denied sub nom. Williams v. New York,* —— U.S. ——, 109 S.Ct. 3255, 106 L.Ed.2d 601 (1989), *reh. denied,* —— U.S. ——, 110 S.Ct. 27, 106 L.Ed.2d 638 (1989); *Massachusetts v. Bowen,* 679

F.Supp. 137, 147 (D.Mass.1988), *aff'd* 873 F.2d 1528 (1st Cir.1989), withdrawn pending reconsideration *en banc; Planned Parenthood Fed. of America v. Bowen,* 680 F.Supp. 1465, 1473 (D.Colo.1988). In each of those cases, plaintiffs challenged regulations promulgated by the U.S. Department of Health and Human Services (HHS) which barred abortion counseling services from receiving federal funds. The challenged regulations in those cases provided that "to remain eligible [for grants under Title X of the Family Planning Services and Population Research Act], a project may not provide counseling or referral for abortion as a method of family planning." *New York v. Bowen, supra,* 690 F.Supp. at 1264 (citing 42 C.F.R. § 59.8(a)(1)). The regulations also provided that a Title X project may not "encourage, promote, or advocate abortion as a method of family planning." *Id.* at 1265 (quoting 42 C.F.R. § 59.10(a)). In *New York v. Bowen,* physician and organizational plaintiffs were providers and/or supervisors of abortion and family planning services and recipients of Title X grant funds; they sued on behalf of themselves and their staffs and patients. Although all of them performed abortions at one or more of their locations, none used Title X funds for that purpose. *Id.* at 1263. The state plaintiff was a Title X grantee which distributed the federal funds to local agencies. *Id. Cf. Planned Parenthood Fed. of America v. Bowen, supra,* 680 F.Supp. 1465 (plaintiffs physicians and family planning organizations); *Massachusetts v. Bowen, supra,* 679 F.Supp. 137 (plaintiffs state and health clinics receiving federal funds).

In all three cases, there was no discussion by the respective courts on the issue of standing. The courts ruled directly on the merits of plaintiffs' contentions without addressing standing. Plaintiffs in the present case cite these three cases for the proposition that organizations receiving federal funds have standing to challenge new content-based restrictions on those funds, whether or not they have already applied and been denied new funding. Pl. Mem. II at 4. Defendants counter that

those three cases did not turn on standing issues and thus are not relevant here.

The district courts in these cases could have raised the issue of standing *sua sponte* even if the issue had not been raised or briefed by the parties. *See, e.g., Juidice v. Vail,* 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977). Therefore, the courts' decisions to address plaintiffs' substantive contentions do bear some, but not persuasive, precedential weight on the question of standing.

More direct assistance comes from the case of *DKT Memorial Fund, Ltd. v. Agency for Int'l Development,* 810 F.2d 1236 (D.C.Cir.1987), *on remand,* 691 F.Supp. 394 (D.D.C.1988). In that case, the United States, through its Agency for International Development ("AID"), implemented a policy committing the United States "not to contribute funds to foreign NGOs [non-governmental organizations], even if they engage in these abortion-related activities with their own, non-AID funds." 810 F.2d at 1237. The district court in that case had initially granted defendants' motion for summary judgment, finding that the NGOs lacked standing "because they could not show injury in fact or that a decision in their favor would redound to their benefit." *Id.* at 1238. In that case, none of the plaintiffs had applied or been rejected for AID funding. *Id.*

The D.C. Circuit reversed the district court. It invoked the Supreme Court's ruling in *Village of Arlington Heights v. Metropolitan Housing Corp.* for its statement that the plaintiff must allege that he seeks and would qualify for the benefit in the absence of the challenged restriction. *Id.* (citing *Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)). The appeals court also pointed to its prior decision in *West Virginia Ass'n of Community Health Centers, Inc. v. Heckler,* 236 U.S.App.D.C. 287, 734 F.2d 1570 (1984) that "[u]nder this line of cases, once [plaintiff]-appellants demonstrated that they would qualify to receive these funds, they need not shoulder the additional burden of demonstrating that they are certain

to receive funding." *Id.* (quoting *West Virginia Ass'n of Community Health Centers, supra,* 734 F.2d at 1576). Thus it appears fairly well settled that for purposes of standing, plaintiffs need not actually apply for funding and be denied in order to challenge a restrictive funding policy; instead, they need only demonstrate that but for the CDC and statutory restrictions, they would qualify to receive CDC funding for their AIDS education projects.

Consequently, defendants' challenge to plaintiffs' standing in this case must fail. Several plaintiffs (*i.e.,* Tavern Guild, Horizons, and the New York State plaintiffs) demonstrate their eligibility in the best way possible: they are all currently operating under grants from the CDC. Another plaintiff, GMHC, demonstrates that it is "otherwise eligible" and would have applied for CDC funding in that GMHC in fact received federal funding for its programs in 1986 and 1987.

Defendants do not contradict the alleged eligibility of these or the other plaintiffs. Instead, they attempt to distinguish the present case from *DKT* and its predecessors. They point out that the procedure for being denied CDC funds for AIDS education has many more steps than the procedures in the above cases. Defendants posit that in order for plaintiffs to obtain standing, they must first apply for and receive CDC funding; next, submit to the local PRPs program proposals which they know do not comply with statutory or agency restrictions; then, upon denial of permission to go forward with those projects, pursue them anyhow; finally, if and when the CDC notices the projects' noncompliance, cuts off further funding, and demands reimbursement for funds wrongfully spent, only then would plaintiffs have standing to sue. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Reply Memorandum in Support of Defendants' Motion to Dismiss (hereinafter "Def.Mem. III"), at 14–15.

This Court finds this account of the standing requirement unpersuasive. *DKT* clearly says that plaintiffs only need to

show that they would otherwise be eligible for funding, and that they need not actually apply for funding and be denied before they can attain standing to challenge the regulations. The number of steps involved in the process of reviewing proposals is of no consequence to the analysis put forth by the *DKT* court.[10] This Court will not insist that these organizations go through the charade of applying for and receiving CDC funding to develop programs that plaintiffs presume are "clearly barred," *see*, Declaration of Robert Edwards, Executive Director of Tavern Guild, ¶ 5, only to have their presumptions confirmed by a local PRP, possibly many months and many dollars later. If the sample material submitted to this Court by plaintiffs GMHC and Tavern Guild is any indication, the information that plaintiffs seek to produce and distribute with CDC funds would most probably not meet with the approval of the local PRPs. *See, e.g.*, "Eroticizing Safer Sex," attached to the Declaration of Timothy Sweeney, Deputy Executive Director for Policy of GMHC.[11] A local PRP has already rejected a safe sex newsletter called "Hot and Healthy Times" for its "blunt language," although the PRP's members considered the item educational. Supplemental Declaration of Robert Edwards, Executive Director, Tavern Guild.

Defendants' proposed standing requirement would lead to vast public and private inefficiencies. It would force federal and state governments and non-profit organizations needlessly to expend precious time and money in order to arrive at a foregone conclusion: that many of the materials plaintiffs seek to produce and distribute with federal funds "encourage or promote homosexual sexual behavior," and/or are "offensive to most educated adults." This Court declines to apply such a wooden and inefficient conception of standing.

■ Defendants would also distinguish this case from *DKT* by pointing out that there, federal funds were *categorically* denied to NGOs that performed or actively promoted abortions. By contrast, in this case, federal funds would be denied only for those projects that promote or encourage homosexual behavior or use language that is offensive. Grantee organizations can receive federal funds for projects in compliance with the regulations, and could simultaneously use non-federal funds to support noncomplying projects. Def.Mem. III at 12–13.

The Court finds that this difference, too, is specious for purposes of standing. This argument, like the one above, speaks to the number of steps an organization must go through in order to ascertain its ineligibility for funding. It is clear from the materials presented by plaintiffs that their proposed projects will not meet the grant terms. Whether categorical or readily inferable, the ineligibility of these projects is clear. Plaintiffs have established, to this Court's satisfaction, the first and second elements of standing.

Defendants do not deny that the third element of standing is present. Declaratory and injunctive relief requested by plaintiffs would, if granted, remedy their alleged injury. Therefore, this element is also satisfied, and plaintiffs' standing is established.

---

**10.** If it were, then Congress and government agencies would have a perverse incentive to create layers of bureaucracy for the approval of federally-funded projects, in order to discourage challenges to funding restrictions.

**11.** In fact, plaintiff GMHC has especially good reason to think that its proposals would not have satisfied the requirements of the Helms amendment: the amendment seems to have been inspired, at least in part, by Senator Helms' recitation on the Senate floor of excerpts from a GMHC grant proposal. The Senator quoted from the proposal:

"For many [gay men], safe sex has been equated with boring, unsatisfying sex. Meaningful alternatives are often not realized. These perceived barriers must be considered and alternatives to high-risk practices promoted in the implementation of AIDS risk-reduction education."
Senator Helms then commented: "[E]very Christian, religious, moral ethic within me cries out to do something. It is embarrassing to stand on the Senate floor and talk about the details of this travesty ... Good Lord, Mr. President, I may throw up." 133 Cong. Rec. S14203 (Oct. 14, 1987) (quoted in Pl.Mem. I at 8–9).

Because at least some of the organizational plaintiffs have alleged facts sufficient to establish standing, we need not consider the standing of each plaintiff individually. The presence of at least one plaintiff who can demonstrate standing allows this lawsuit to go forward. *See Village of Arlington Hts., supra,* 429 U.S. at 264 n. 9, 97 S.Ct. at 562 n. 9.

## II. Mootness

In a footnote, the government asserts that because the fiscal year 1988 appropriations Act, including the Helms amendment, expired by its terms on September 30, 1988, plaintiffs' claims regarding the 1988 grant terms are moot. Def.Mem. I at 26, n.\*\*; Def.Mem. III at 32 n.\*. They also defend against plaintiffs' challenge to the CDC grant terms on the basis of laches. Def. Mem. I at 26 n.\*\*.

As for mootness, the last fiscal 1988 grant involved in this litigation, that of Horizons Community Services, expired by its terms on September 30, 1989. Therefore, the challenge to the Helms Amendment language is moot. Plaintiffs argue that the one-year funding restriction should survive under the "capable of repetition, yet evading review" doctrine. Pl.Mem. I at 27 n. 7. While it may be true that one-year funding schemes are difficult to challenge in court because the timeline of a lawsuit frequently extends well beyond a year, that argument in this case is not persuasive. When the Senate debated its fiscal 1990 budget, it adopted an amendment almost identical to the Kennedy/Cranston amendment, which is not challenged in this action. *See* 135 Cong.Rec. S11583, S11587, S11593. Therefore, the Helms amendment restrictions, which were challenged, will not be repeated in the coming fiscal year.

The CDC grant terms are a different matter altogether. Although the Helms and Kennedy/Cranston amendment covered only one-year periods, the CDC's grant terms seem to carry over from one year to the next. *Cf.* 51 Fed.Reg. 3427, 3431 (Jan. 27, 1986) [1986 CDC grant terms]; 52 Fed.Reg. 7028 (March 6, 1987) [1987 CDC grant terms]; 53 Fed.Reg. 6034–35 [1988 CDC grant terms]; 54 Fed. Reg. 663 (January 9, 1989) [1989 CDC grant terms]. Despite the changes in the above provisions due to the various Congressional amendments, the CDC-imposed "offensiveness" restrictions have remained more or less stable over time. Therefore, they are properly subject to review.

The equitable doctrine of laches involves "unreasonable delay" by the plaintiff coupled with "undue prejudice" to the defendant. *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). As to the first element, the government contends that plaintiffs did not challenge the 1988 funding restrictions until October, 1988, although they knew about them as early as December 1987; therefore, the government argues, plaintiffs should have brought their lawsuit at that time, before the CDC funds were expended. The government defendants also complain that were plaintiffs to prevail in this lawsuit, the government would have to "abandon the administrative structure it has established for more than three years and forgo all controls over program materials produced with fiscal year 1988 federal funds." Def.Mem. III at 32 n.\* (citing Noble II Decl., ¶ 11.)

Concerning the aspect of delay, there are no facts on the record to indicate that plaintiffs failed to pursue their claims diligently. Eight months is not an "unreasonable delay" for five non-profit educational and medical service organizations to coordinate a challenge to the constitutionality of ongoing governmental regulations. Defendants' reliance on *Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985), presumably for the proposition that a laches defense may lie after only ten weeks, is misplaced. That case involved a preliminary injunction, where plaintiffs bore the burden of proving irreparable injury. *Id.* at 275. Defendants' laches defense will not lie.

## III. Defendants' Motions for Dismissal and/or Summary Judgment.

### A. *Standards for Summary Judgment.*

Summary judgment is appropriate where "the pleadings, depositions, answers

to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support an essential element of the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[12] The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

### B. *Defendants Motion to Dismiss Plaintiffs' First Cause of Action.*

Plaintiffs contend as a first cause of action that the 1988 and 1989 CDC grant terms are inconsistent with the Kennedy/Cranston amendment. First Amended Complaint at 18. The first half of this two-part claim is that by requiring all fiscal 1989 federally-funded AIDS education materials to be " 'inoffensive to most educated adults beyond [the target] group,' " the agency has "acted beyond its authority." Pl.Mem. I at 34. The second part amounts to a charge that by incorporating the 1988 restrictions, including the Helms amendment language, into the initial announcement of funds for fiscal year 1989, the Agency applied the 1988 statutory restrictions to applicants for 1989 funds. First Amended Complaint, ¶ 27.

### 1. The Authority of CDC to Promulgate and Enforce the 1989 Grant Terms.

■ Defendants contend that they are entitled to summary judgment on the issue of CDC's authority to enforce its own grant terms in conjunction with the Kennedy/Cranston amendment. Def.Mem. III at 33. They argue that the CDC has general authority to place restrictions on the grants it administers. Moreover, they point out that Congress has never expressly disapproved any portion of the CDC grant terms, and that therefore the grant terms must not be disturbed by this Court. *Id.* In order to prevail on their summary judgment motion, defendants must prove that there is no genuine issue of material fact as to whether the grant terms are a lawful agency interpretation of CDC's enabling legislation and the 1989 appropriations bill.

The Centers for Disease Control is an arm of the Public Health Service, within the Department of Health and Human Services. The Secretary of Health and Human Services derives authority to make project grants from 42 U.S.C. § 247c, entitled "Sexually Transmitted Diseases and Acquired Immune Deficiency Syndrome."

---

**12.** The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2552. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

That section in relevant part directs the Secretary to "make project grants to States and in consultation with the State health authority, to political subdivisions of the States...." 42 U.S.C. § 247c(c). It further instructs that "[g]rants made under [this subsection] shall be made on such terms and conditions as the Secretary finds necessary to carry out the purposes of such subsection...." 42 U.S.C. § 247c(d)(1).[13] The Secretary has in turn promulgated regulations governing grant awards, specifically reserving the capacity to, "at the time of the award, impose additional conditions, including conditions governing the use of information or consent forms, when, in the Secretary's judgment, they are necessary to advance the approved program, the interest of the public health, or the conservation of grant funds." 42 C.F.R. § 51b.106(e).

On the subject of Congressional authorization of agency regulations, the Second Circuit has recently expressed the "well-established rule of statutory interpretation that '[i]f Congress has directly spoken to the precise issue in question, if the intent of Congress is clear, that is the end of the matter.'" Planned Parenthood Fed. v. Agency for Int'l Development ("A.I.D."), 838 F.2d 649, 654 (2nd Cir.1988) (quoting Japan Whaling Ass'n v. American Cetacean Soc., 478 U.S. 221, 223, 106 S.Ct. 2860, 2862, 92 L.Ed.2d 166 (1986)). The Court also explained that when "Congress has explicitly left a gap for the agency to fill," that gap constitutes "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Id. (quoting Chevron, USA v. Natural Resources Defense Council, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)).

In Planned Parenthood v. A.I.D., plaintiffs challenged the actions of A.I.D., a federal government agency, as violative of and exceeding the authority granted it by the Foreign Assistance Act. That Act provides for grants to foreign family planning programs, and authorizes the President "to provide this assistance 'on such terms and conditions as he may determine.'" Planned Parenthood, supra, 838 F.2d at 651 (quoting Foreign Assistance Act of 1961, 22 U.S.C. § 2151b(b)). The President's discretion, however, "is not entirely unfettered." The Act "prohibits the use of federal money for, inter alia, 'the performance of abortions as a method of family planning, or to motivate or coerce any person to practice abortions,' or bio medical research relating to abortion as a means of family planning." Id. (quoting 22 U.S.C. § 2151b(f)(1), (3)). The President's authority is delegated to the Administrator of A.I.D. Id.

In 1984, A.I.D. implemented a new White House policy directive that stated that "the United States will no longer contribute to separate nongovernmental organizations ["NGOs"] which perform or actively promote abortion as a method of family planning in other nations...." Id. Shortly thereafter, the House of Representatives condemned, then endorsed, the new policy directive. Meanwhile, the Senate adopted an amendment prohibiting the implementation of the directive. Both these amendments were ultimately withdrawn "as a compromise to the disparate House and Senate positions...." Id. at 653.

Planned Parenthood sued for declaratory and injunctive relief against enforcement of the new policy, and this Court dismissed the claims, holding that "absent a specific limitation on the Executive's authority to condition dispersal of United States funds

---

**13.** The purposes of section 247c are:

    (1) sexually transmitted diseases surveillance activities, including the reporting, screening, and followup of diagnostic tests for, and diagnosed cases of, sexually transmitted diseases;

    (2) casefinding and case followup activities respecting sexually transmitted diseases, including contact tracing of infectious cases of sexually transmitted diseases and routine test-

ing, including laboratory tests and followup systems;

    (3) interstate epidemiologic referral and followup activities respecting sexually transmitted diseases; and

    (4) such special studies or demonstrations to evaluate or test sexually transmitted diseases prevention and control strategies and activities as may be prescribed by the Secretary.

to foreign NGOs, it must be assumed that Congress has left intact his discretion to refuse to do so." *Planned Parenthood,* 670 F.Supp. 538, 544 (S.D.N.Y.1987) (Walker, J.). The Second Circuit specifically affirmed this holding, *supra,* 838 F.2d at 653, noting that the Act's broad policy statement "does not require A.I.D. to assist all family planning projects that apply for federal funds, and A.I.D. has 'broad discretionary power' to decide which, among numerous competing projects, will be given family planning funds." *Id.* at 654 (citing *Alan Guttmacher Institute v. McPherson,* 616 F.Supp. 195, 207 (S.D.N.Y.1985), *aff'd,* 805 F.2d 1088 (2d Cir.1986)).[14]

The facts in *Planned Parenthood* are closely analogous to those in the present case. Here, the Secretary of Health and Human Services (and his delegatee, the Director of the CDC) has broad discretionary power to choose appropriate recipients of federal AIDS educational funding under pertinent statutes. Also, after several years of no restrictions, the CDC spontaneously (i.e., without new impetus from Congress) adopted restrictions on grant funding. Subsequently, Congress did not specifically address itself to these restrictions, but applied some of its own. But in contrast to the facts in *Planned Parenthood,* here Congress has remained silent about the CDC-imposed grant terms.

In support of their claim that there are no issues of material fact as to whether CDC's grant terms are authorized, defendants point out that "Congress has never expressly disapproved any portion of the CDC grant terms." Def.Mem. III at 33. Plaintiffs reply that neither has Congress authorized the "offensiveness" restriction. Pl. Mem. at 35. That Congress has not, at any time subsequent to CDC's promulgation of its grant terms, adopted or affirmed CDC's restrictions, does not alone provide sufficient cause for this Court to deny defendants' motion for summary judgment. *Planned Parenthood* and *Chevron* teach that, absent inconsistency with an Act of Congress, this Court must defer to an agency's reasonable construction of its own enabling legislation and of the appropriations bills that fund it.

The *Chevron* Court held that when the judiciary reviews an executive department's construction of a statutory scheme, it should defer to a reasonable administrative interpretation. 467 U.S. at 844, 104 S.Ct. at 2782. That case involved a challenge to an Environmental Protection Agency ("EPA") regulatory scheme pursuant to the amended Clean Air Act. The EPA issued regulations permitting industrial manufacturers to consider an entire plant as a single source of emissions, rather than considering each piece of equipment in the plant individually. The Appeals Court vacated the EPA regulations, and the Supreme Court reversed. The Supreme Court instructed the District Court that the question properly before it "was not whether in its view the regulation is 'inappropriate' in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a *reasonable* one." *Id.* (emphasis added).

In order to establish that an administrator's view of the regulations was "reasonable," this Court must inquire whether "the agency considered the matter in a detailed and reasoned fashion." *Id.* at 865, 104 S.Ct. at 2793 (citing *SEC v. Sloan,* 436 U.S. 103, 117, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); other citations omitted.) For example, in *Chevron,* the E.P.A. published in March 1981 a formal proposed rulemaking containing a draft of the regulations which were ultimately the subject of the lawsuit. 46 Fed.Reg. 16280 (March 12, 1981). That formal proposed rulemaking announced a one-month comment peri-

---

14. The policy statement, found at 22 U.S.C. § 2151(a), provides in pertinent part:

[T]he Congress declares that a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions which will improve the quality of their lives. *Planned Parenthood v. A.I.D.,* 838 F.2d at 652 n. 1.

od, and the final regulations were promulgated in October 1981. 46 Fed.Reg. 50766.

There is not enough evidence on the record to establish, for summary judgment purposes, that the process of promulgating the CDC regulations in this case rises to the level of "detailed and reasoned consideration." None of the materials submitted by either party indicates that there was a public notice of the proposed "offensiveness" restrictions followed by a comment period. The only indication of the deliberative process presented thus far is the letter from Donald Berreth of CDC indicating that sometime after the CDC announced the availability of AIDS funding on July 25, 1985, the CDC became "concern[ed] over the explicit content of some of the proposed written and audiovisual materials." The agency subsequently "developed the guidelines" which were published in the notice dated January 29, 1986. Berreth letter, attached as Exhibit K to Quadland Declaration.

This information is not sufficient for this Court to find on a summary judgment motion that CDC considered the grant terms in a "detailed and reasonable fashion." *Chevron* and *Planned Parenthood* do require a high degree of deference to agency actions not inconsistent with Congressional authorization, but that deference is subject to reasonableness conditions that have not yet been established by defendants. Accordingly the Court refrains from judgment on this issue until such time as further information is before it.

Similarly, the Court declines to grant plaintiff's cross-motion for summary judgment on this issue. Neither is there enough evidence on the record to determine that the CDC did *not* consider the grant terms in a "detailed and reasonable fashion." Under *Chevron*, defendants' burden on this question is minimal, and further discovery will reveal whether it can be met.[15]

2. The Initial Announcement of Availability of 1989 CDC Funds

▮ Plaintiffs aver that CDC applied the 1988 restrictions including the Helms amendment language, to applicants for 1989 funds. First Amended Complaint ¶ 27. Defendants admit that they incorporated the 1988 terms into their first announcement of availability of fiscal 1989 funds. They explain that the announcement of anticipated availability of funds was published in the Federal Register on August 10 and September 20, 1988 but that the President did not sign the legislation until September 28, 1988. They state that they announced the anticipated availability of funds before the appropriations bill was signed because the agency required "long lead times" between grant announcements and completion of the award process. Declaration of John L. Williams, executed February 28, 1989, ¶¶ 6–8. They later updated the announcement to incorporate the 1989 terms. 65 Fed.Reg. 10049–51 (March 9, 1989).

Defendants furthermore explain that the 1988 grant terms were never actually applied to any fiscal 1989 grant applications. Plaintiffs, however, insist that the erroneous announcement generated confusion, some of which remains undispelled even by the corrective announcement. Pl. Mem. II at 20. Plaintiffs in this litigation can be expected to be aware of the materials contained in their own submissions to the Court, which include numerous reference to the 1989 updated grant terms. Therefore, this Court sees no genuine issue going to the question of whether some plaintiffs remain confused about the fiscal 1989 grant criteria.

For these reasons, defendants' motion for summary judgment on this issue is granted, and plaintiffs' motion on this issue is hereby denied.

C. *Defendants' Motion to Dismiss Plaintiffs' Second and Fourth Causes of Action.*

▮ Plaintiffs' second and fourth causes of action, respectively, are facial constitutional challenges to the Helms Amendment and the CDC restrictions based on the first and fifth amendments.

---

15. The question of what discovery is appropriate is taken up *infra.*

The second cause of action has been mooted, *see supra.* As to the fourth cause of action, defendants contend that it fails to state a claim. They reason that selective government subsidies of speech by their nature are not considered viewpoint-based regulations and therefore are subject only to rational basis review. Def. Mem. III at 40–41. They further contend that the CDC regulations pass the rational review test. Plaintiffs reply that because the purpose or effect of the regulations is to suppress certain ideas, the strict scrutiny standard of review applies. Pl. Mem. II at 32. They add that even if rational review applies, the CDC regulations do not meet the test.

A long line of cases has considered and rejected arguments much like those plaintiffs advance. *See, e.g., Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 *reh. denied* 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980); *Regan v. Taxation With Representation of Washington* ("TWR"), 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Lyng v. International Union,* 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988); *State of New York v. Bowen, supra,* 690 F.Supp. 1261 (S.D.N.Y.), *aff'd. sub nom. New York v. Sullivan,* 889 F.2d 401 (2d Cir.1989). In each of these cases, the Courts held that conditions on subsidies of fundamental rights does not come under strict scrutiny analysis. The Courts "reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized...." *State of New York v. Bowen, supra,* 690 F.Supp. at 1273 (quoting *TWR, supra,* 461 U.S. at 546, 103 S.Ct. at 2001 and *Lyng, supra,* 108 S.Ct. at 1190).

The Courts have held "in several contexts [including the First Amendment] that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Id.* at 1190 (quoting *TWR, supra,* 461 U.S. at 549, 103 S.Ct. at 2002) (brackets as in *Lyng* ). In *Lyng,* unions and union members challenged an amendment to the Food Stamp Act precluding, *inter alia,* households from becoming eligible for food stamps if a member of the household were on strike. There, union members unsuccessfully argued that the amendment infringed first amendment rights of association and expression and fifth amendment rights of equal protection. 108 S.Ct. at 1188.

As discussed *supra, Bowen* involved a grantee's challenge to HHS regulations prohibiting, *inter alia,* Title X projects from counselling or referring clients for abortion as a method of family planning. 690 F.Supp. at 1262–63. Plaintiffs in that case unsuccessfully claimed that the regulation burdened the fundamental right of free speech. This Court concluded that

> ... HHS's regulations, which merely withhold grants of federal funds from those who wish to counsel women about abortion, refer them to abortion providers, or advocate, encourage or promote abortion in other ways, do not violate the rights of either such persons or their patients. The regulations do not prohibit or compel speech. They grant money to support one view and not another, but that is quite different from infringing on free speech.

*Id.* at 1273–74. These cases compel the conclusion that conditional government subsidies designed to further a legitimate governmental interest are permissible so long as rationally related to a legitimate governmental objective. *Lyng, supra,* 108 S.Ct. at 1192.

In January of 1986, when CDC first issued its grant terms, it explained the rationale for them as follows:

> Implementing programs to promote a "safer sex" risk reduction strategy may involve supporting the communication of suggestions using candid terms, some of which may be offensive to society at large. The Centers for Disease Control (CDC) is answerable for the use of Federal funds and broad support is vital to its public health mission. CDC also has an obligation to take actions designed to control the spread of HTLV–III/LAV. This guidance is meant to promote such actions, and to require local review panels to consider the bounds of explicitness

believed needed to communicate an effective message to those for whom it is intended.

51 Fed.Reg. 3427, 3431 (Jan. 27, 1986). A recent revision of the guidance document eliminates this passage, but contains the statement that

> ... [m]essages must be provided to the public that emphasize the ways by which individuals can fully protect themselves from acquiring the virus. They include abstinence from the illegal use of IV drugs and from sexual intercourse except in a mutually monogamous relationship. For those individuals who do not eliminate risky behavior, methods of reducing their risk of acquiring or spreading the virus must also be communicated. Such messages can be controversial. This document is intended to provide guidance for the development of educational materials and to require the establishment of local review panels to consider the appropriateness of messages designed to communicate with various population groups.

54 Fed.Reg. 10049, 10050 (March 9, 1989).

The stated purposes of the regulations thus include CDC's desire to garner broad public support for its programs and/or ensure that appropriate messages are targeted to various communities. While these policies are without doubt legitimate governmental objectives, it is not obvious to the Court how the "offensiveness" restrictions rationally relate to them.[16] The discovery which will ensue from the earlier question of whether the grant terms were "considered in a detailed and reasoned fashion," *supra*, will presumably shed light on the question of the rationality of the relationship between policy and rule.

For the same reason, summary judgment is denied to plaintiffs until further discovery is taken.

D. *Defendants' Dispositive Motion on Plaintiffs' Third and Fifth Causes of Action.*

■ Plaintiffs challenge the fiscal 1988 and 1989 statutes, including the CDC grant terms, as applied to them. They claim that the restrictions "are being applied so arbitrarily nationwide that they are deterred from developing materials that might be deemed controversial for any reason by a Program Review Panel or the CDC." Pl. Mem. II at 46. Defendants seek to dismiss these as-applied claims on the ground that no plaintiff has shown that its requests for approval of program materials have been arbitrarily disapproved by any PRP. Def. Mem. III at 66. Discovery has already begun on the as-applied claims. This discovery, especially the retrieval and examination of Program Review Panel (PRP) reports reviewing proposals, should continue in order for the parties and the Court to gain a better sense of how the funding restrictions are applied, and consequently what effect this application has upon plaintiffs. Moreover, discovery of the State plaintiff's records for evidence of the "chilling effect" of the restrictions as applied should go forward at this time.[17] Defendants' motion for summary judgment on this issue is denied. Plaintiffs do not move for summary judgment on this issue, instead conceding the need for further discovery.

---

16. The relationship might be that CDC perceives that sexually explicit federally-funded AIDS educational materials could jeopardize community support for such projects. If this is the link, the government should so argue.

17. The Court referred this matter to Magistrate Leonard A. Bernikow for discovery purposes. Magistrate Bernikow, in a Report and Recommendation issued on August 17, 1989, crafted an arrangement between the parties for the State plaintiffs to produce evidence that its subgrantees have been "chilled and deterred from producing" certain AIDS educational materials as a result of the funding restrictions. Report and Recommendation at 9. The scheme, which calls for responses from a sampling of the approximately 50 state subgrantees, sensibly balances the defendants' need for specific information about the alleged chilling effect against the State's administrative burden in obtaining and sorting through these materials. *Id.* at 20. This arrangement should go forward. Parties should note, however, that information regarding the chilling effect of the Helms amendment is no longer germane to this dispute because the challenges to it have been mooted.

E. *Defendants' Dispositive Motion on Plaintiff's Void-for-Vagueness Claim.*

■ Plaintiffs challenge the "offensiveness" aspect of the CDC grant terms as void for vagueness. Defendants counter that the void-for-vagueness doctrine is not applicable to the subsidy context, or if it applies at all, it does with the "most relaxed of standards." Def.Mem. III at 76.

The twin purposes of vagueness doctrine are to provide fair notice to affected individuals that their conduct falls within a particular category, and to guard against arbitrary and discriminatory enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Vagueness doctrine clearly can be applied to government subsidies of speech. In *Planned Parenthood of Central and Northern Arizona v. Arizona,* 718 F.2d 938 (9th Cir.1983), the court analyzed an Arizona family planning statute in vagueness terms. There, the state legislature forbade expenditure of state funds to nongovernmental "agencies or entities which offer abortions, abortion procedures, counseling for abortion procedures or abortion referrals." *Id.* at 94: (quoting 1980 Ariz. Sess.Laws 842, 860 m.*). That language was held not to be impermissibly vague. The court specifically held that the funding statute must "give adequate notice of what sorts of statements [an organization] must refrain from making in order for [it] to remain eligible to receive" public funding. *Id.* at 947 (citing *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976)).

The Ninth Circuit *Planned Parenthood* court outlined a mixed level of scrutiny for a vagueness challenge to subsidized speech. On one hand, it called for "relatively more stringent scrutiny" because of the free speech dimension, *id.* at 948 (citing *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)). On the other hand, the court indicated that it is "more tolerant of possible vagueness in laws that impose civil rather than criminal penalties 'because the conse-quences of imprecision are qualitatively less severe.'" *Id.* (quoting *Flipside, supra,* 455 U.S. at 499, 102 S.Ct. at 1193; other cites omitted). Moreover, the court stated that its "tolerance should be even greater in a case, such as the one before us, where the consequence of noncompliance with the enactment is not a civil penalty, but merely reduction of a government subsidy." *Id.*

The court ultimately sustained the appropriations bill against the vagueness challenge. It said that "due process does not demand unattainable feats of statutory clarity," *id.* at 948 (quoting *United States v. Maude,* 156 U.S.App.D.C. 378, 481 F.2d 1062, 1068 (1973)), and that "'absolute precision in drafting laws is not demanded,' particularly where the law does not impose a criminal penalty. *Id.* (quoting *High Ol' Times, Inc. v. Busbee,* 673 F.2d 1225, 1229 (11th Cir.1982)). In its holding, the court relied on an opinion issued by the Arizona state attorney general elaborating the meaning of the contested phrase, "counseling for abortion procedures."

The regulations challenged here are different in several respects. First, the directive is much more complex than a mere proscription on the expenditure of state funds on organizations which perform abortion counseling. The regulations challenged in this litigation instructs grantees to confine their programs to

terms or descriptors ... which a reasonable person would conclude should be understood by a broad cross-section of educated adults in society, or which when used to communicate with a specific group, such as homosexual men, about high risk practices, would be judged by a reasonable person to be inoffensive to most educated adults beyond that group.

"Basic Principles," subpara. (b). This instruction is immediately followed by the injunction that grantees must use

language ... understood by a broad cross-section of educated adults in society but which a reasonable person would not judge to be offensive to such people.

*Id.,* subpara. (c).

Now the Court is mindful of the Ninth and D.C. Circuits' caution that "due pro-

cess does not demand unattainable feats of statutory clarity ... [or] absolute precision," *Planned Parenthood, supra; Maude, supra.* But the instructions that appear in subparagraphs (b) and (c) could stump even the most persevering reader. As plaintiffs point out, no guidance is given "as to who constitutes an 'educated adult.' Does this mean high school graduates, college graduates, or persons with doctoral degrees? ... Are educated adults less likely or more likely to be offended than uneducated adults?" Pl.Mem. II at 25–26. To these queries the Court adds, how is the "reasonable person" to determine what would be understandable or inoffensive to the "educated adult," assuming these two entities are different? The unclarity of this language is sufficient to raise a genuine issue for trial as to whether it is capable of meaningful and nonarbitrary application.

As a second distinction from *Planned Parenthood,* the CDC in the present case has not set forth a clarification of the disputed terms. The CDC does provide a guidance document entitled "Content of AIDS–Related Written Materials, Pictorials, Audiovisuals, Questionnaires, Survey Instruments, and Educational Sessions," reprinted in full on several occasions in the Federal Register. *See e.g.,* 54 Fed.Reg. 10049, 10050 (March 9, 1989). This document contains the policy statements concerning CDC's desire to referee dissemination of "controversial" federally-funded materials. However, unlike the Arizona attorney general's statement in *Planned Parenthood,* CDC's guidance document does not define or elaborate the challenged language.

Therefore, this Court declines to grant summary judgment to defendants on the issue of vagueness. However, neither will the Court grant summary judgment to the plaintiffs on this issue. The question remains whether the CDC regulations can validly be applied to any proposal for funding. *Brache v. County of Westchester,* 658 F.2d 47, 50 (2d Cir.1981) (citing *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975); other cites omitted). "Facial vagueness occurs when a statute is expressed in terms of such generality that 'no standard of conduct is specified at all.' ... Such a provision simply has *no core.*" *Id.* at 50–51 (quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) and *Smith v. Goguen,* 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974) (emphasis in original). This rule is similarly applied in the regulatory context. *See, e.g., Austin Bldg. Co. v. Occupational Safety and Health Review Commission,* 647 F.2d 1063, 1066 (10th Cir.1981) ("In considering a challenge that an administrative regulation is void for vagueness, we do not view the language of the statute as an abstraction or apply it in hypothetical fact situations; rather we judge the regulation in the light of the conduct to which it is applied"). Therefore, it remains for plaintiffs to show that the statute has no core meaning in any of its applications. A fuller presentation and analysis of the PRP reports that plaintiffs have proffered to this Court in connection with these motions will aid in this determination at trial.[18]

IV. Outstanding Discovery Issues

■ This matter was referred to Magistrate Leonard A. Bernikow for resolution of troublesome discovery issues. Only one of those issues is presently contested. Magistrate Bernikow directed the government to produce documents related to the CDC's development and adoption of the "offensiveness" grant terms. Discovery Order 6 (hereinafter "D.O.").

The Magistrate found that the issue of CDC's motive in adopting the regulations is relevant to plaintiffs' present constitutional and statutory challenges. D.O. at 3. He based this finding on several grounds:

if plaintiff[s] can show that defendants' implementation of the restrictions was motivated by an improper purpose, such

---

**18.** The Court suggests that this challenged language would be an appropriate subject of settlement discussions among the parties.

as one to suppress speech, the restrictions would be unconstitutional as applied. Similarly, if plaintiff[s] can show that the CDC restrictions were developed for improper purposes then the challenge to the face of the restriction has merit. *Id.* at 3.

Defendants objected (and continue to object) that this material is protected from discovery by the governmental deliberative privilege. Magistrate Bernikow recognized the deliberative process privilege, but found that it was outweighed in this case. He cited the case of *Gray v. Board of Higher Education,* 692 F.2d 901 (2d Cir. 1982) for the proposition that a holder of the privilege may, in appropriate cases, substitute a "meaningful statement of reasons" for divulgence of deliberative process materials. D.O. at 5. But the Magistrate suggested that such a statement of reasons would be insufficient in this case. "[W]ithout the documents the plaintiff[s] cannot make [their] case. To what other sources can plaintiff[s] turn to determine whether any improper motive is behind these restrictions?" *Id.* at 6.

Defendants object to the Magistrates' discovery order. They claim that the Magistrate erred in not examining the documents *in camera* or making a request for a more detailed declaration of what the documents contain. They insist that no court can adequately balance competing claims of privilege and relevance without first making an "itemized ruling" on each disputed document. Defendants' Objections to Magistrate's Report at 8. In connection with this discovery dispute, defendants have submitted the declaration of Dr. James Mason, the United States Assistant Secretary for Health (hereinafter "Mason Declaration"). Dr. Mason's declaration identifies 12 documents which, in his opinion, "reflect internal deliberations at the Centers for Disease Control," and thus would be subject to the deliberative process privilege. Mason Declaration at 2–5.

Plaintiffs counter that the Magistrate correctly found that the agency's motive is relevant to the resolution of the issues in this case. Therefore, they reason, the government must unconditionally reveal the contents of all of the disputed internal agency documents to plaintiffs' attorneys. Plaintiffs' Response to Defendants' Objections to Magistrate's Discovery Ruling at 2, 10.

Unfortunately, Magistrate Bernikow did not have the benefit of the Court's ruling on the above summary judgment motions at the time he issued his discovery orders. Therefore, the Court will reconsider the privilege question in light of the above holdings and will modify the discovery instructions accordingly. In the present Memorandum, this Court has determined that defendants could not prevail on summary judgment on two questions of law because further discovery was needed. These questions were: (1) whether the CDC considered the regulations in a "detailed and reasonable fashion," consistent with *Chevron;* and (2) whether the regulations bear a "rational relationship" to legitimate governmental objectives, as required by the First Amendment in federally-subsidized speech cases. Both parties should be aware that defendants' burden on these two claims is minimal.

This Court will remand discovery to Magistrate Bernikow to examine the twelve documents listed by Dr. Mason *in camera.* The Magistrate should determine which of them go to the specific issues outlined above. He will then duly weigh the deliberative process privilege against plaintiffs' claim of relevance, and determine which documents are discoverable.

The remainder of discovery in this case should go forward consistent with this opinion and with Magistrate Bernikow's directions.

## CONCLUSION

Plaintiffs have established that they have standing to bring this lawsuit. However, their Helms Amendment claims are moot at this time. The Court denies defendant's applications for summary judgment on the question of CDC's authority to promulgate the grant terms, on narrow grounds, and also denies plaintiff's motion on that issue. Defendants' summary judg-

**641**

ment motion on the CDC's alleged application of the 1988 regulations to 1989 funding proposals is granted. The Court denies defendants' application for summary judgment on the question of the facial validity of the CDC restrictions, on narrow grounds. Plaintiffs' summary judgment motion on this issue is also denied. Plaintiff's "as-applied" claims survive summary judgment review, and discovery is directed to go forward on this claim at this time. Plaintiffs' vagueness claims also withstand defendant's motions, and discovery should proceed. As to the Magistrate's ruling on defendants' disclosure of certain privileged documents, that ruling is modified as set forth above. A hearing before the Magistrate should promptly be scheduled to resolve the remaining discovery issues.

SO ORDERED.